UNITED STATES of America,
Plaintiff,

v.

Willie SMALL, Dachaun Davis, Keyonna Davis, Alvin Green, Theolian Lloyd, Curtis Hawkins, Zebedee Hall, James Starkey, Edward Palmer, Frederic Williams, Herbert Lewis, Jr., Angela Brewer, Daniel McIntyre, Jeff Abreu, Max Cooper, George Murray, Ernest Gaddis, Victor Mendinghall, Sammy Woods, Ronald Clark, Bridget Johnson, Timothy Chandler, Carlos Johnson, Dwayne Van Dyke, Thurman McKnight, Charles Young, Brian Harris, Dayna Drew, and Tommy Jones, Defendants.

No. CR. 01–CR–214–D.

United States District Court,
D. Colorado.

Oct. 22, 2002.

Kathleen Melissa Tafoya, United States Attorney's Office, Denver, CO, for Plaintiff.

Matthew C. Golla, Federal Public Defenders Office, Denver, CO, Michael J. Norton, Burns, Figa & Will, P.C., Englewood, CO, Boston Henry Stanton, Jr., Boston H. Stanton, Jr., Law Offices, Denver, CO, Richard James Banta, Richard J. Banta, Denver, CO, John Henry Schlie, John Henry Schlie & Barry A. Schwartz, PC, Denver, CO, John S. Tatum, John S. Tatum, PC, Aurora, CO, James S. Covino, James S. Covino, P.C., Englewood, CO, Randy S. Reisch, R. Scott Reisch, Denver, CO, Jonathan S. Willett, Willett & Mestas, LLC, Denver, CO, John Andrew Chanin, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, Kirkland Leonard Brush, Kirkland L. Brush, Fort Collins, CO, Lynn Anne Pierce, Butler, Landrum & Pierce, P.C., Lakewood, CO, Clifford J. Barnard, Clifford J. Barnard, Esq., Boulder, CO, Jeffrey S. Pagliuca, Holland & Pagliuca, PC, Denver, CO, Michael Gary Root, Denver, CO, Richard N. Stuckey, Richard N. Stuckey, P.C., Denver, CO, David Barry Savitz, Denver, CO, Wade H. Eldridge, Wade H. Eldridge, P.C., Denver, CO, M. David Lindsey, Denver, CO, Darren R. Cantor, Darren R. Cantor, Esq., Denver, CO, Kerry Steven Hada, Kerry S. Hada, PC, Englewood, CO, Martha Horwitz Eskesen, Martha H. Eskesen, PC, Denver, CO, John F. Sullivan, III, Denver, CO, Edward A. Pluss, Denver, CO, Christopher Bradley Calbo, C. Bradley Calbo, Law Office, Arvada, CO, Dennis W. Hartley, Dennis W. Hartley, P.C., Colorado Springs, CO, Mitchell Baker, Mitchell Baker & Associates, Denver, CO, Christopher R. Decker, Decker & DeChar, LLC, Denver, CO, William Michael Whelan, Jr., Boulder, CO, Jeffrey Richard Edelman, Jeffery R. Edelman, PC, Parker, CO, Robert T. McAllister, Robert T. McAllister, PC, Denver, CO, Wazir-Ali Muham Al-Haqq, Wazir-Ali Muhammad, Denver, CO, Wendelin Williams DeLoach, DeLoach Law Offices, Aurora, CO, Alaurice Marie Tafoya, Alaurice Tafoya, Law Office, Denver, CO, Robert Seldis Berger, Robert S. Berger, P.C., Denver, CO, for Defendants.

## ORDER

DANIEL, District Judge.

THIS MATTER is before the Court on Defendants' motions to suppress evidence obtained through two wiretaps and extensions thereto authorized by United States Senior District Judge Zita L. Weinshienk. In the course of investigating the Willie Small Drug Distribution Organization ("Defendant Small's Organization" or "the Organization"), the Government applied for and received authorization to conduct electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.* As a result of these interceptions, law enforcement arrested Defendant Willie Small and numerous members of the Organization pursuant to a multi-count Indictment that was filed on June 7, 2001. Defendants moved to suppress the evidence obtained as a result of these wiretaps and the Court conducted evidentiary hearings on Defendants' motions on March 11, 12, 13, 14 and June 12, 2002. I carefully considered and evaluated Defendants' challenges to these Title III intercepts and, for the reasons set forth below, Defendants' motions to suppress are **DENIED.**[1]

---

1. For purposes of this Order, the following motions are treated together: Defendant Willie Small's Motion to Suppress Wiretap Evidence and for a Franks Hearing; Defendant Keyonna Davis's Motion to Suppress Interceptions of Wire Communications of Defendant; Defendant Alvin Green's Motion to Suppress Evidence Derived from Court Ordered Interceptions of Electronic Wire Communications and for Franks Hearing;

## I. BACKGROUND OF THE INVESTIGATION

The investigation, resulting in the prosecution of these Defendants, was conducted by the Metro Gang Task Force ("MGTF") and began in approximately September 2000. The lead case agent who worked on the investigation was Todd Wilcox ("Agent Wilcox"), a special agent with the Federal Bureau of Investigation with more than ten years experience as a law enforcement officer. As part of their investigation, members of the MGTF utilized the assistance of one confidential source ("CS–1"). During the period of the investigation from September 2000 to January 2001, CS–1 conducted nine controlled purchases from the Organization which yielded a total of approximately 243 grams of crack cocaine.

The investigation also used, with varying degrees of success, surveillance, witness interviews, pen registers, trap and trace information, criminal history information, and record searches. According to the Affidavits submitted in support of the wiretap Applications, these investigative methods were insufficient to meet the stated objectives of the investigation. The objectives of the investigation were to obtain admissible evidence of: (1) information leading to the identification of all of the individuals supplying Defendant Small's Organization, and others yet unknown, with controlled substances (cocaine and crack cocaine); (2) information leading to the identification of the persons distributing and transporting controlled substances (cocaine and crack cocaine) on behalf of Defendant Small's Organization, and others yet unknown; (3) information leading to the identification of the times and locations of meetings during which Defendant Small's Organization, and others yet unknown, distributed to others controlled substances (cocaine and crack cocaine) for further distribution; (4) identification of other communication facilities (wire, oral and/or electronic) utilized by Defendant Small's Organization, and others yet unknown, in furtherance of their criminal activity; (5) the complete nature and scope of Defendant Small's Organization; and (6) the times of importation into, and the delivery of, the controlled substances (cocaine and crack cocaine) within the District of Colorado. *See, e.g.,* Gov't Ex. 1B ¶ 10.

On March 28, 2001, the Government sought authority to install a wiretap on a cellular telephone used by Defendant Small. Judge Weinshienk authorized the interception of wire communications from that facility and on April 20, 2001, she authorized the Government to install a

Defendant Theolian Lloyd's Motion to Suppress Information Obtained in Illegal Wiretaps; Defendant Curtis Hawkins's Motion to Suppress Electronic Communications and for Franks Hearing (Wiretap Evidence); Defendant Zebedee Hall's Motion to Suppress Wiretap Evidence and for Franks Hearing; Defendant Edward Palmer's Motion to Suppress Wiretap Evidence and for Franks Hearing; Defendant Fredric Williams's Motion to Suppress Evidence Obtained by Wiretaps; Defendant George Melvin Murray's Motion to Suppress Wiretap Evidence and for Franks Hearing; Defendant Victor Mendinghall's Motion to Suppress Wiretap Evidence; Defendant Sammy Lee Woods's Motion to Suppress Various Wiretap Interceptions and the Fruits Thereof; Defendant Ronald Dennis Clark's Motion to Suppress Interceptions of Wire Communications and Request for Leave to Supplement this Motion After an Evidentiary Hearing; Defendant Timothy Chandler's Motion to Suppress Wiretap Evidence and for a Franks Hearing; Defendant Brian Harris's Motion to Suppress Wiretap Evidence and for Franks Hearing; Defendant Angela Hernandez's Motion to Suppress Wiretap and for a Franks Hearing. In addition, certain Defendants have moved to joined the above-mentioned motions to suppress. In instances in which a Defendant moved for relief by joining the motion of a Co–Defendant, the motion of the joining Defendant is disposed of in the same manner as those briefed and argued by counsel.

wiretap on Defendant Small's home telephone. She eventually granted two extension Orders for continued interceptions of Defendant Small's cellular telephone and one extension Order for the continued interception of Defendant Small's home telephone.

On June 7, 2001, a sixty-two count Indictment was returned against twenty-nine Defendants charging twenty-eight of those Defendants with knowingly and intentionally conspiring to distribute and possess crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii), 846 and 18 U.S.C. § 2. On August 8, 2001, an eighty-count Superseding Indictment was returned, adding three additional Defendants to the case, charging Defendant Thurman McKnight in the conspiracy count, and adding additional charges against some of the Defendants who were charged in the original Indictment.[2]

## II. DETAILS CONCERNING THE WIRETAPS

### (1) First Wiretap: 01–WT–06 (issued March 28, 2001; extended on April 27, 2001, and May 25, 2001)

The first wiretap Order ("First Wiretap"), intercepted communications from cellular telephone number (720) 291–7113, subscribed to John Small, 10150 E. Virginia Avenue, Bldg. 6–205, Denver, Colorado, and was believed to be used primarily by Willie Small. *See* Gov't Exs. 1A, 2A and 3A. The "Main Targets" of the First Wiretap were "WILLIE SMALL, and THE WILLIE SMALL DRUG DISTRIBUTION ORGANIZATION[.]" *Id.* The "Named Interceptees" were: Willie Small; John Small; Keyonna Davis; Dachaun Davis; Rodney Marshall, James Starkey; Lalisha Jackson; Verna Hicks; Alvin Green; and Thomas Manzanares. *See* Gov't Ex. 1A. The first extension to this

wiretap, which was granted on April 27, 2001, added Theolian Lloyd, Angela Brewer, Jeff Abreu, Edward Palmer, Daniel McIntyre, Herbert Lewis, Jr., Curtis Hawkins, Zebedee Hall, Brian Harris and Max Cooper to the list of "Named Interceptees." *See* Gov't Ex. 2A. A second and final extension to (720) 291–7113 was granted on May 25, 2001. This extension added Dawan Eugene Smith, George Murray, Bridget Johnson, Timothy Chandler, Ernest Gaddis, Frederic Williams, Clarence Threatt, Sammy Woods, Michele Clark, Monta Smith, Ronald Clark and Victor Mendinghall to the list of "Named Interceptees." *See* Gov't Ex. 3A. The second and final extension to the First Wiretap terminated on June 15, 2001.

### (2) Second Wiretap: 01–WT–10 (issued April 20, 2001; extended on May 18, 2001)

The second wiretap Order ("Second Wiretap"), intercepted communications from telephone number (720) 747–4732, subscribed to Dachaun Davis, 1939 South Quebec Way, Bldg. K–1001, Denver, Colorado, and was believed to be used primarily by Dachaun Davis and Willie Small. The "Main Targets" of the Second Wiretap were also "WILLIE SMALL, and THE WILLIE SMALL DRUG DISTRIBUTION ORGANIZATION[.]" The "Named Interceptees" were: Willie Small; John Small, Keyonna Davis; Dachaun Davis; Rodney Marshall, James Starkey; Lalisha Jackson; Verna Hicks; Alvin Green; Thomas Manzanares; Theolian Lloyd; Angela Brewer; Jeff Abreu; Edward Palmer; and Herbert Lewis, Jr. *See* Gov't Ex. 4B. An extension was granted on the Second Wiretap on May 18, 2001. The extension added Daniel McIntyre, Curtis Hawkins, Zebedee Hall, Brian Harris, Max Cooper, Dawan Eugene Smith, George

---

**2.** Defendant Thurman McKnight was subsequently dismissed from the conspiracy count on November 16, 2001, upon the Government's motion to dismiss.

Murray, Bridget Johnson, Timothy Chandler, Ernest Gaddis, Frederic Williams and Clarence Threatt to the list of "Named Interceptees." *See* Gov't Ex. 5B. The extension to (720) 747–4732 terminated on June 15, 2001.

## III. TITLE III WIRETAPS

■ The federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2522 (1994 & Supp.2000), establishes a three-tiered procedure for obtaining authorization to intercept wire or oral communications. Strict adherence to these procedural steps is a prerequisite to issuance of a wiretap order. *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). First, a duly authorized law enforcement officer must obtain approval from the United States Attorney General or a specifically designated Assistant Attorney General in order to apply to a federal judge for a wiretap. *See* 18 U.S.C. § 2516(1). Second, once such approval is obtained, the officer must present to the judge a written application for a wiretap. *See* 18 U.S.C. § 2518(1). Third, the judge must make certain enumerated findings and may issue an *ex parte* order containing specified elements. *See* 18 U.S.C. § 2518(3). Title III further provides for the suppression of all evidence derived from a wiretap if "the communication was unlawfully intercepted," or "the order of authorization or approval under which it was intercepted is insufficient on its face," or "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a).

Defendants move to suppress the intercepted communications on the grounds that: (1) the Government's Applications and Affidavits are facially insufficient and failed to satisfy the "necessity" requirement set forth in 18 U.S.C. §§ 2518(1)(c) and (3)(c); (2) the Affidavits contained material misrepresentations and omissions that negate or vitiate the "necessity" and probable cause findings; (3) the Applications, Orders and the First Affidavit contained several 'technical violations' of the wiretap statute; (4) the Application and Order for the First Wiretap failed to name certain interceptees; (5) the Government failed to properly "minimize" the intercepted communications; and (6) the Government failed to demonstrate probable cause for each interceptee. These arguments will be addressed *seriatim.*

## IV. THE 'NECESSITY' REQUIREMENT

■ A wiretap authorization order is presumed proper and the defendants have the burden of overcoming that presumption. *United States v. Vanmeter,* 278 F.3d 1156, 1163 (10th Cir.2002). Title III requires that the Government's wiretap application include "a full, and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). In addition, the judge issuing the order must make a finding that "[n]ormal investigative procedures have been tried and have failed or reasonably appear to be either unlikely to succeed if tried or are too dangerous." 18 U.S.C. § 2518(3)(c). Thus, before a wiretap is authorized the Government must demonstrate, and the issuing judge must conclude, that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous.[3] The purpose of these two

---

**3.** In *United States v. Ramirez–Encarnacion,* the court resolved a conflict of authority in the Tenth Circuit regarding the proper standard of review for a district court's determination that a wiretap application satisfied the

requirements is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Castillo–Garcia*, 117 F.3d at 1179, 1185 (10th Cir.1997).

■ The Tenth Circuit defines traditional investigative techniques as: "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants." *Ramirez–Encarnacion*, 291 F.3d at 1222, n. 2 (internal quotation marks and citations omitted). Pen registers and trap-and-trace devices are also included in the range of traditional techniques. *Id.* If any of these investigative techniques has not been tried, the Government must explain with particularity why each such unattempted technique would be either unsuccessful or too dangerous. *Id.* However, "the Government's failure to explain its use or non-use of normal investigative techniques will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." *Castillo–Garcia*, 117 F.3d at 1188.

■ The Government's burden of establishing its compliance with subsection 2518(1)(c) is not great and should be reviewed in a practical and commonsense fashion. *Id.* at 1187. "Merely because a normal investigative technique is theoretically possible it does not follow that it is likely." S. REP. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190. The wiretapping statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir.2000) (citing *United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir.1979)).

■ Finally, the Government is only required to demonstrate necessity as to the primary targets of the wiretaps. *United States v. Mitchell*, 274 F.3d 1307, 1312 (10th Cir.2001). Defendants, however, rely on the Tenth Circuit's unpublished decision of *United States v. Arrington*, 216 F.3d 1088, 2000 WL 775576 (10th Cir. 2000), and argue that the necessity showing must be made as to each interceptee individually. I agree with the Government that the *Arrington* decision should be limited to its facts and that I should follow the Tenth Circuit's more recent pronouncement in *Mitchell.* 274 F.3d at 1312 (neces-

necessity requirement. 291 F.3d 1219 (10th Cir.2002). The decision provided, in pertinent part:

[a]fter reviewing the relevant authority, we have concluded that the *Armendariz* court properly stated the standard of review: "Although we examine de novo whether 'a full and complete statement' was submitted meeting section 2518(1)(c)'s requirements, we review the conclusion that the wiretap[ ][was] necessary in each situation for an abuse of discretion." [*United States v.*

*Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990) ] (quoting *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985)).

*Id.* at 1222, n. 1. The Government asserts that I should similarly review Judge Weinshienk's conclusion that the wiretaps were necessary for an abuse of discretion. Because I find that the Government demonstrated a sufficient showing of necessity to meet either a de novo or an abuse of discretion standard, I need not address the Government's contention in this case.

sity for a wiretap is not required to be shown as to all named interceptees).

Defendants' arguments that the wiretaps failed to satisfy the "necessity" requirement fall into two categories: (1) facial challenges to the sufficiency of the Affidavits filed in support of the wiretap Applications; and (2) subfacial challenges to the Affidavits, *i.e.,* Defendants question the veracity of the Affidavits by asserting that they contain material misstatements and omissions. As to Defendants' facial challenges to the Affidavits, I confine my analysis to the information before Judge Weinshienk: the Applications (Gov't Exs. 1A, 2A, 3A, 4A and 5A), the Affidavits in support of the Applications (Gov't Exs. 1B, 2B, 3B, 4B and 5B), the Orders authorizing the interception of wire communications (Gov't Exs. 1C, 2C, 3C, 4C and 5C) and the *in camera* proceedings (Gov't Exs. 1E, 2D, 4D, 5D).[4] Defendants' subfacial challenges to the Affidavits are addressed under the framework of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), in Section "V." of this Order. My analysis under *Franks* takes into account all of the information before Judge Weinshienk as well as the evidence adduced at the hearings before me.

With these considerations in mind, I now examine each wiretap Application and accompanying Affidavit at issue in this case to determine whether they comply with Title III's 'necessity' requirement.

A. *FACIAL CHALLENGES TO THE SUFFICIENCY OF THE AFFIDAVITS*

1. FIRST WIRETAP (CELLULAR TELEPHONE), 01–WT–06

Defendants contend the Affidavit for the First Wiretap ("First Affidavit") is facially

insufficient because law enforcement officers achieved success with traditional investigative methods and the First Affidavit contained "boilerplate" and conclusory statements regarding necessity that merely tracked the language of the statute. As set forth below, my examination demonstrates that the First Affidavit was facially sufficient and satisfied the "necessity" requirement of Title III.

(a.) SURVEILLANCE

■ The First Affidavit explained that investigators performed extensive surveillance before applying for the First Wiretap. Gov't Ex. 1B ¶¶ 25–113, 230–248. Surveillance observed CS–1 make controlled buys from Defendant Small, Defendant Dachaun Davis and Defendant Keyonna Davis at various locations including a gas station and a McDonald's restaurant. *Id.* at ¶¶ 28, 32, 54, 61, 70, 78, 88, 100. Surveillance of Defendant Small at the times and locations of controlled narcotics purchases revealed his address, two automobiles he frequently used, potential storage facilities for narcotics and that Defendants Dachaun Davis and Keyonna Davis appeared to be distributing crack cocaine at Defendant Small's direction. *Id.* at ¶¶ 27–28, 36, 43, 61, 64, 70, 80, 88, 230–32, 234. Investigators also conducted surveillance and traffic stops in an attempt to identify the occupants of the vehicles that interacted with Defendant Small. *Id.* at ¶¶ 38, 45–46, 72, 91, 93–94, 104, 108. Further, beginning in early March 2001, surveillance of the areas surrounding Defendant Small's prior and new residences was conducted by a remote controlled video camera. *Id.* at ¶¶ 110–111.

---

4. A district court may properly limit its review of the issuing judge's necessity determination to the information that was before the issuing judge. *United States v. Carrillo,* 123 F.Supp.2d 1223, 1231 (D.Colo.2000); *see also*

*Mitchell,* 274 F.3d at 1309 n. 1 ("our determination of whether the district court erred in denying the motions to suppress is, as was the district court['s], limited to the consideration of these affidavits").

Nonetheless, the physical surveillance did not adequately meet the objectives of the investigation. The First Affidavit explained that physical surveillance of the persons involved in the operation of the conspiracy had failed to reveal the full scope of Defendant Small's Organization, had not shown where and how often the delivery of narcotics occurred, nor had it revealed potential suppliers to the Organization. *Id.* at ¶¶ 249–253. Surveillance merely revealed the suspects in the company of other persons allegedly involved in the conspiracy. Surveillance had revealed significant foot traffic and short meetings at Defendant Small's and Defendant Keyonna Davis's residences but surveillance could not reveal the purpose or the nature of those meetings. Moreover, such surveillance also ironically threatened to jeopardize the investigation's success. The First Affidavit explained that Defendant Small moved because of increased police presence—that is, physical surveillance—at his residence. *Id.* at ¶ 99. Thus, the First Affidavit sufficiently demonstrated that surveillance was tried but failed to reveal the Organization's suppliers or the full scope of the Organization.

### (b.) QUESTIONING AND INTERROGATION OF WITNESSES OR PARTICIPANTS

■ The First Affidavit set forth in detail the questioning of witnesses that took place during the pre-wiretap stage of the investigation. Gov't Ex. 1B ¶¶ 49–51, 258–61, 271. In October 2000, agents stopped James Starkey after observing what appeared to be a drug transaction between Starkey and Defendant Small. *Id.* at ¶¶ 50, 258. Upon being asked to cooperate with law enforcement, Starkey agreed, corroborated information provided by CS–1 and was released with instructions to contact investigators the following day. *Id.* at ¶¶ 258–59. Starkey never contacted the agents as promised and even prevented agents from contacting him by

disconnecting his pager. *Id.* The First Affidavit described two instances where agents conducted traffic stops involving individuals that surveillance observed meeting with Defendant Small. *Id.* at ¶¶ 38, 91. Those stops, however, did not result in an opportunity for agents to question or interrogate the alleged witnesses or participants. *Id.*

The First Affidavit further explained why questioning or interrogating potential witnesses identified prior to this wiretap Application, such as Defendants Dachaun Davis, Keyonna Davis, Alvin Green, James Starkey, Rodney Marshall, and Thomas Manzanares, was unlikely to succeed in developing evidence about the members of Defendant Small's Organization or was too dangerous. Because of the close knit, familial nature of the Organization, only Defendant Small, Keyonna Davis and Dachaun Davis were known to have sufficient knowledge of the inner workings of the Organization and the other witnesses could only provide information duplicative of that provided by CS–1 and Starkey. The First Affidavit stated that the risk to investigation posed by approaching these witnesses was not worth the benefit derived from their assistance. *Id.* at ¶¶ 265, 267, 273. The First Affidavit further provided that witnesses were unlikely to provide information to authorities about Defendant Small's operations because of their relationship with Defendant Small. *Id.* at ¶¶ 265, 273, 278. The First Affidavit also indicated that one suspect, Alvin Green, had previously cooperated with the Government in a different investigation, but proved too untrustworthy to continue that relationship. *Id.* at ¶ 269. No other potentially useful witnesses could be safely approached at the time of the wiretap request. *Id.* at ¶ 275. Consequently, the specific and particularized information in the First Affidavit demonstrates that the above-mentioned potential witnesses would

not assist agents in achieving the investigation's stated objectives.

The First Affidavit also indicated that interviews or grand jury testimony would be detrimental to achieving the objectives of the investigation because they might have alerted other conspirators to the investigation. *Id.* at ¶¶ 276–79. Finally, any grant of immunity would be equally ineffective because it would have foreclosed prosecution of the most culpable members of the conspiracy and could not ensure that immunized witnesses would provide truthful testimony. *Id.* at ¶ 279.

**(c.) SEARCH WARRANTS**

■ In the First Affidavit, Agent Wilcox stated that probable cause existed to obtain a search warrant for Defendant Small's residences at 10150 E. Virginia Ave., Bldg. 6–205 and 1939 S. Quebec Way, Building K–1001, and that he thought he also had probable cause to obtain a search warrant for Defendant Keyonna Davis's residence at 425 South Galena Way, Building 4–108. Gov't Ex. 1B ¶ 282. However, agents concluded that executing search warrants would jeopardize the investigation and was unlikely to succeed in achieving the objectives of the investigation. The search of the above-mentioned residences would only implicate Defendant Small and Defendant Keyonna Davis and would merely provide additional bases to charge those Defendants without providing admissible evidence against any suppliers or co-conspirators. *Id.* at ¶¶ 283–85. Finally, the First Affidavit stated that executing search warrants would most likely cause the suspects to flee, destroy evidence, or halt their business. Based on the foregoing, I conclude that the Affidavit and Application for the First Wiretap sufficiently explained that the execution of search warrants was unlikely to expose the scope of the Organization or the Organization's suppliers and could have jeopardized the investigation before completion of its objectives.

**(d). INFILTRATION AND INFORMANTS**

■ Prior to submission of the First Wiretap Application on March 28, 2001, CS–1 could no longer serve as an informant because her identity had been revealed in a separate investigation. Gov't Ex. 1B ¶ 257. In the First Affidavit, Agent Wilcox explained that he discussed the possibility of introducing an undercover agent to Defendant Small with CS–1 in November 2000. *Id.* at ¶ 272. The Affidavit explained that CS–1 informed Agent Wilcox that Defendant Small only dealt with people whom he trusted. *Id.* The First Affidavit also described an incident wherein Defendant Small became angry when an individual attempted to introduce him to a stranger. *Id.*

The First Affidavit also described Agent Wilcox's consideration of placing an informant or an undercover officer at the business locations where Defendant Small or other named interceptees were believed to be working.[5] *Id.* at ¶ 274. This option was rejected because, at best, the new confidential informant or undercover agent would duplicate the evidence obtained by CS–1. During her participation in the investigation, CS–1 made nine drug purchases in ever-increasing quantities from Defendant Small's Organization. Despite CS–1's dealings with the inner circle of Defendant Small's Organization, CS–1 was not able to describe the full scope of the Organization nor was she able to provide investigators with any knowledge of the Organization's suppliers.

---

**5.** See discussion *infra* regarding the decision to not place an undercover officer in Club Mix in Section V, subsection A.2.

The First Affidavit detailed the use for five months of one confidential source and why the Government "failed to make the case" during the time she assisted the investigation. It described investigator's inability to develop another confidential source and explained why using an undercover agent was unlikely to succeed or was too dangerous. Accordingly, the Government provided Judge Weinshienk with a full and complete statement regarding confidential informants and undercover agents.

### (e.) PEN REGISTERS OR TRAP-AND-TRACE DEVICES

 On October 5, 2000, pen registers and trap and trace devices were authorized for Target Telephone One—Defendant Small's cellular telephone subject to the First Wiretap. Gov't Ex. 1B ¶ 116. The First Affidavit states that pen registers and trap-and-trace devices were subsequently approved for eight additional telephones associated with Defendant Small's Organization. *Id.* at ¶¶ 114–33, 136, 139–41, 154, 159–80. The First Affidavit summarized the particular information gleaned from utilizing both pen registers and trap-and-trace devices for the time period of September 25, 2000, to March 19, 2001. *Id.* at ¶¶ 126–33, 136, 139–41, 154, 159–80.

Although the pen registers and trap-and-traces disclosed called or calling telephone numbers, which law enforcement officers used to obtain subscriber information, such information was of limited use to investigators. For example, investigators could not identify the individuals placing or receiving the telephone calls from the pen register and trap-and-trace data, only the identity of the individual who subscribed to that particular telephone number.

### (f.) OTHER INVESTIGATIVE TECHNIQUES

 Beyond *Castillo–Garcia*'s five traditional investigative techniques, investigators engaged in public records searches to augment their investigative techniques. The First Affidavit sets forth particularized information regarding additional investigative techniques used by law enforcement, such as: searching criminal histories and computer records; checking records from the United States Postal Service, Public Service utilities, F.B.I. Butte Information Technology Center ("F.B.I. Butte check"), Colorado Department of Labor, Western Union/Money Gram, Financial Crimes Enforcement Network ("FinCen"), and Lexis–Nexis/Choicepoint. Gov't Ex. 1B ¶¶ 181–219. Tax records regarding the alleged members of Defendant Small's Organization were also examined. *Id.* at ¶¶ 220–24. The First Affidavit explained that searches of criminal history and computer records revealed little about the suspected drug conspiracy. *Id.* at ¶¶ 18–21, 39, 44, 47–48, 73–74, 81–82, 105, 134–35, 137–38, 142–53, 155–58.

Further, the First Affidavit provided that investigators searched postal records and public service information for various members of Defendant Small's Organization. *Id.* at ¶¶ 181–90. Although helpful, this information merely corroborated investigators' suspicions regarding the addresses where Defendant Small and certain co-conspirators resided or spent a considerable amount of time. *Id.* at ¶¶ 181, 183. Further, contacting the F.B.I. Butte Information Technology Center, checking the Department of Labor wage reports and checking wire transfers through Western Union and MoneyGram only provided some useful information. *Id.* at ¶¶ 191–212.

### 2. SECOND WIRETAP (HOME TELEPHONE); 01–WT–10–Z

 Defendants contend that the Affidavit filed in support of the Second Wiretap ("Second Affidavit") did not set forth a "full and complete" statement pur-

suant to 18 U.S.C. § 2518(1)(c) because it was essentially a carbon copy of the Affidavit for the First Wiretap. Even assuming that the Second Affidavit was remarkably similar to the Affidavit for the First Wiretap, that fact alone would not negate a necessity finding for the Second Wiretap. In comparison to the First Wiretap, the Second Wiretap sought approval for interceptions on Defendant Small's home telephone instead of his cellular telephone. The need for an additional wiretap in this case did not result from the identification of a "new target" during the interceptions of the First Wiretap. The targets of the Second Wiretap were the same targets identified in the First Wiretap. Further, the Second Affidavit demonstrated that the Organization continued to operate in the same manner as described in the First Affidavit. The use of similar language in the Second Affidavit was inevitable under these circumstances.

In addition, Defendants claim that the Second Affidavit did not disclose whether investigators performed certain traditional investigative techniques, specifically, additional record checks from the United States Postal Service, Public Service utilities, F.B.I. Butte Information Technology Center ("F.B.I. Butte check"), Colorado Department of Labor, Western Union/Money Gram, Financial Crimes Enforcement Network ("FinCen"), and Lexis–Nexis/Choicepoint. While this statement is not completely accurate, a "full and complete" statement does not mean that the Government disclose to an issuing judge every minute detail of an investigation or every conceivable lead not followed. As set forth *supra*, the Government's failure to explain its use or non-use of normal investigative techniques will not be fatal to its wiretap application in all cases.

██ Each wiretap, standing alone, must still satisfy the necessity requirement. *United States v. Carneiro*, 861 F.2d

1171, 1176 (9th Cir.1988). The Second Affidavit incorporated the First Affidavit and described the information obtained from the interceptions for the First Wiretap. The Second Affidavit also contains two new sections devoted entirely to evidence related to Defendant Small's home telephone. *See* Gov't Ex. 4B ¶¶ 124–163. As set forth below, I find that the Affidavit and Application for the Second Wiretap satisfied the necessity requirement of § 2518(1)(c).

**(a.) SURVEILLANCE**

The Second Affidavit provided the results obtained from continued surveillance of the suspects following the authorization of the First Wiretap on March 28, 2001. Gov't Ex. 4B ¶¶ 36, 39, 44, 47, 49, 52, 57–58, 65–67, 76, 80–82, 86, 89, 93, 96, 100, 127, 147. The Second Affidavit described how agents continued to observe Defendant Small meeting with various individuals under circumstances similar to his narcotics transactions with CS–1. *Id.* Surveillance identified numerous individuals, including some newly identified by use of the First Wiretap, making narcotics transactions with Defendant Small at various locations. *Id.* Even with the benefit of the First Wiretap, however, surveillance was still incapable of establishing drug sources and had not revealed the full extent of Defendant Small's distribution to his clientele. *Id.* at ¶¶ 253, 257–58.

**(b.) QUESTIONING AND INTERROGATION OF WITNESSES OR PARTICIPANTS**

In addition to the information incorporated from the First Affidavit, the Second Affidavit detailed unsuccessful efforts to question and interrogate newly identified witnesses since the commencement of the First Wiretap. The Affidavit described the questioning of Carlos Johnson after he was arrested leaving Defendant Small's

home in a vehicle that was listed as stolen. Gov't Ex. 4B ¶¶ 82–83. Johnson agreed to cooperate with investigators and informed them that the crack found on him at the time of his arrest came from a dealer named "Big Mike." *Id.* He was unable to provide further information regarding "Big Mike's" whereabouts or how to contact him. The Second Affidavit indicated that Agent Wilcox believed Johnson's source of crack to be Defendant Small but did not ask Johnson specific questions about Defendant Small so as to not alert him to the ongoing investigation. *Id.* at ¶ 84.

The Second Affidavit continued to reflect Agent Wilcox's fear that Keyonna Davis and Dachaun Davis, as close relatives of Defendant Small, would alert him to the ongoing investigation if they were questioned. *Id.* at ¶¶ 266, 267, 272. In addition, newly learned facts about previously identified witnesses or participants confirmed law enforcement's decisions not to question or interrogate those individuals. The fact that only Defendant Small and a few close family members accessed Defendant Small's narcotics supply was evident from several conversations intercepted in the short period since the First Wiretap had been granted. Gov't Ex. 4B at ¶¶ 98, 114, 120–21, 157, 159. Thus, I find that the Second Affidavit sufficiently established that questioning and interrogation of witnesses or participants had been tried and failed and was unlikely to succeed if tried with other known witnesses or participants or was too dangerous.

### (c.) SEARCH WARRANTS

The same justifications mentioned for not searching Defendant Keyonna Davis's or Defendant Small's residences stated in the First Affidavit were incorporated in and applied to the Second Affidavit. The execution of search warrants at those locations would not identify drug suppliers, methods of delivery, or purchasers. Gov't Ex. 4B ¶ 293. The Second Affidavit also described intercepted communications relating to another building, located at 1313 Xenia Street, Denver, Colorado, where Defendant Small might have been storing narcotics. *Id.* at ¶¶ 95, 96, 104. The agents did not have probable cause to search that location when they submitted the Application for the Second Wiretap. *Id.* at ¶¶ 291–94.

### (d.) INFILTRATION AND INFORMANTS

The Second Affidavit stated that investigators had not discovered any additional prospective informants with knowledge of Defendant Small's drug conspiracy since the commencement of the First Wiretap. Gov't Ex. 4B ¶¶ 282–83. Indeed, it was also confirmed during the same interim period that the Organization appeared to be a close knit, family run drug organization. *Id.* at ¶ 98, 114, 120–21, 155–61, 280. Additionally, investigators intercepted a call on April 3, 2001, in which Defendant Small specifically stated he would deal only with an exclusive set of individuals. *Id.* at ¶ 112. Accordingly, agents continued to doubt that an undercover officer could begin a successful narcotics relationship with Defendant Small through various business venues. *Id.* at ¶ 281. The Second Affidavit incorporates the details of CS–1's involvement in the investigation and explained Agent Wilcox's reasonable conclusion that attempts to use undercover agents or further attempts to use confidential informants was unlikely to succeed or was too dangerous.

### (e.) PEN REGISTERS OR TRAP–AND–TRACE DEVICES

Pen registers and trap-and-trace devices disclosed that calls frequently were made from the subject landline telephone to other telephones suspected to be involved in the trafficking of narcotics. Gov't Ex. 4B ¶ 175–80, 297. However, as was true for

the instance of the March 28, 2001, Wiretap Application, pen register information alone could not reveal the identities of the persons making or receiving phone calls, the nature of the business being conducted, or the contents or purposes of the conversations. *Id.* at ¶¶ 297–99.

#### (f.) OTHER INVESTIGATIVE TECHNIQUES

The Second Affidavit sets forth limited results from additional investigative techniques. Specifically, the Second Affidavit demonstrated that investigators searched postal records and public service information for three new addresses obtained during the investigation. *Id.* at ¶¶ 185–87, 194. The Second Affidavit also detailed the results of previous attempts to learn useful information from contacting the F.B.I. Butte Information Technology Center, checking the Department of Labor wage reports, and checking wire transfers through Western Union and MoneyGram. *Id.* ¶¶ 181–228. Although these techniques provided some useful information, they were inadequate to advance or complete the investigation's objectives.

#### 3. FIRST EXTENSION OF FIRST WIRETAP, (CELLULAR TELEPHONE) 01–WT–06

██ Under 18 U.S.C. § 2518(5), "[e]xtensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section." The Application and Affidavit for the first extension to the First Wiretap, 01–WT–06, dated April 27, 2001, detailed information obtained during the first thirty days of the First Wiretap, and after the first few days of interceptions on the Second Wiretap and incorporated the Affidavits from the First and Second Wiretaps. As set forth below, I find that the Government complied with §§ 2518(1)(c) and (5) for the first extension to the First Wiretap.

#### (a.) SURVEILLANCE

With two wiretaps now in place, the Affidavit for the first extension to the First Wiretap detailed several instances where physical and electronic surveillance, used in tandem, verified the continued participation of certain individuals in Defendant Small's Organization, and led to the identification of other possible participants. Gov't Ex. 2B ¶¶ 43–45, 61, 67, 80, 83, 87, 109, 114, 119–20, 136. The Affidavit also described several intercepted communications where Defendant Small indicated that he was expecting his narcotics supplier to arrive on a flight from California. *Id.* at ¶¶ 101, 102, 105, 130. However, using physical and electronic surveillance failed to conclusively identify any suppliers during this time period. The Affidavit also detailed an instance when surveillance was detected. *Id.* at ¶ 142. Therefore, I find that the Application and Affidavit for the first extension of 01–WT–06 sufficiently established that surveillance continued to be used or attempted, but was unlikely to be successful.

#### (b.) QUESTIONING AND INTERROGATION OF WITNESSES OR PARTICIPANTS

The Affidavit described investigators' interactions with new potential witnesses or participants, including Douglas Dugar. *See* Gov't Ex. 2B ¶ 136. The Affidavit explained agents' fear of interviewing Dugar because he was likely to alert Defendant Small to the investigation. *Id.* at ¶ 320. The Affidavits demonstrated that none of the potential witnesses—be they long known or recently discovered—would likely cooperate or advance the investigation. No other witnesses were known to be willing to cooperate. *Id.* at ¶ 318.

#### (c.) SEARCH WARRANTS

No new residences evidenced sufficient probable cause to execute a search war-

rant. Gov't Ex. 2B ¶ 330. Accordingly, I find that the Application and Affidavit for the first extension of the First Wiretap dated April 27, 2001, sufficiently demonstrated that use of search warrants was unlikely to be successful in attaining the investigation's objectives.

#### (d.) INFILTRATION AND INFORMANTS

This Affidavit described continued interceptions reflecting the insular and tight-knit group participating in Defendant Small's Organization. Gov't Ex. 2B ¶¶ 86, 155–60, 170, 190, 316. Furthermore, no new information suggested that informants or undercover agents would be more likely than at any prior time in establishing a narcotics relationship with Defendant Small. *Id.* at ¶ 170, 317.

#### (e.) PEN REGISTERS OR TRAP-AND-TRACE DEVICES

The Affidavit sufficiently explained that pen register, trap-and-trace, and toll information was subject to the same limitations noted in the previous Applications and Affidavits and would not advance the investigation. *See* Gov't Ex. 2B ¶ 335.

#### 4. FIRST EXTENSION OF SECOND WIRETAP (HOME TELEPHONE), 01–WT–10

█ The Affidavit for the first extension of the Second Wiretap, 01–WT–10, dated May 18, 2001, incorporated information obtained during the first thirty days of that wiretap and also information from the first forty days on the First Wiretap, 01–WT–06. The Affidavit contained repeated references to Defendant Small's conversations regarding a slowdown in his business, but verified that Defendant Small continued to be distributing a significant amount of controlled substances. Gov't Ex. 5–B, ¶¶ 21–99.

#### (a.) SURVEILLANCE

Although the combination of surveillance and wiretapping detected potential narcot-

ics transactions between Defendant Small and several individuals including some previously unknown persons, investigators believed continued surveillance alone would be unable to conclusively establish the sources and storage locations of the drugs and money, or the roles of each conspirator. *Id.* at ¶¶ 28–34, 37, 41–42, 47–50, 59–60, 75–78, 89–90, 186, 187–89.

In sum, the Application and Affidavit for the first extension of the Second Wiretap, dated May 18, 2001, established that surveillance was ongoing and that continued surveillance would likely be unsuccessful by itself in advancing the investigation.

#### (b.) QUESTIONING AND INTERROGATION OF WITNESSES OR PARTICIPANTS

The Application and Affidavit for the first extension of the Second Wiretap as well as the testimony of the applicants to Judge Weinshienk during the *in camera* hearings, reiterated the difficulty with questioning or interrogation of known and newly discovered witnesses and participants. *See* Gov't Ex. 5D, p. 3–5. During the *in camera* hearing, Agent Wilcox described the recent arrests of Edward Palmer and Ronald Clark and explained their unwillingness to cooperate with investigators. *Id.* This Affidavit, together with the information presented orally to Judge Weinshienk, sufficiently explained that questioning and interrogation of witnesses or participants had failed and, if pursued further, was unlikely to succeed and would jeopardize the investigation.

#### (c.) SEARCH WARRANTS

The Affidavits for the First Wiretap, its first extension, and the Second Wiretap set forth the reasons why search warrants were not sought for the residences for which authorities might have sustained probable cause to search. This Affidavit described newly intercepted conversations

between Defendant Small and a woman identified to be Bridget Johnson, which confirmed investigators' suspicions that Defendant Small was storing drugs at Johnson's apartment located at 1313 Xenia Street, # 401, Denver, Colorado. Gov't Ex. 5B ¶¶ 35, 36, 61, 62. However, this Affidavit explained why a search of this apartment would not adequately advance law enforcement's attempts to expose the scope of the conspiracy and could expose the investigation and threaten its success. *Id.* at ¶¶ 235–36. No other known residences evidenced sufficient probable cause to be searched. *Id.* at ¶¶ 232–36.

### (d.) INFILTRATION AND INFORMANTS

Although law enforcement continued to try to entice conspirators to act as informants once they were arrested on other matters, the possibility of recruiting a new informant or placing an undercover officer in a meaningful narcotics relationship with Defendant Small remained remote. Gov't Ex. 5B ¶¶ 39, 87, 218–21, 224; Gov't Ex. 5D, p. 3–5. During the *in camera* hearing with Judge Weinshienk, the Applicant, through Assistant United States Attorney ("AUSA") Kathleen M. Tafoya, stated, "[W]e're unable to really develop any confidential informants in this case. They've all been to prison so many times, they're so savvy that they just won't [talk to us]." Gov't Ex. 5D, p. 5. Further, the Affidavit detailed that even in the midst of a downturn in business, Defendant Small abhorred the idea of meeting "new people" to transact business. *See* Gov't Ex. 5B ¶¶ 39, 87.

I find that the Application and Affidavit for the first extension of the Second Wiretap dated May 18, 2001, sufficiently showed that further attempts to use additional confidential informants or undercover officers had failed, were not likely to succeed or were too dangerous.

### (e.) PEN REGISTERS OR TRAP-AND-TRACE DEVICES

Pen registers, trap-and-traces, and toll information continued to be gathered for the telephones associated with Defendant Small, but were subject to the same limitations noted previously. Gov't Ex. 5B ¶¶ 237–40. Moreover, absent additional authorizations for interception, the investigators believed that these investigative methods had been used "to a point of diminishing marginal returns." *Id.* at ¶ 237.

### 5. SECOND EXTENSION OF FIRST WIRETAP (CELLULAR TELEPHONE) 01–WT–06

The Affidavit for the second extension to wiretap 01–WT–06 dated May 25, 2001, detailed information obtained during the first sixty days of the cellular phone wiretap and the first thirty plus days on Defendant Small's home telephone.

### (a.) SURVEILLANCE

Surveillance, in conjunction with interceptions, continued to suggest locations where drugs and money were being exchanged, and helped identify potential co-conspirators in the Defendant Small's Organization. Gov't Ex. 3B ¶¶ 22–101. In particular, this Affidavit detailed surveillance on Defendant Alvin Green, suspected of being one of Defendant Small's suppliers, as he traveled to Los Angeles. *Id.* at ¶¶ 48–51, 80–83, 85–87, 90–101. Law enforcement trailed Defendant Green on May 23, 2001, from Denver to Los Angeles, California, where surveillance was continued to determine whether he was purchasing cocaine or crack cocaine. *Id.* at ¶¶ 98–100. Officers believed Defendant Green might have been suspicious that he was being followed. *Id.* at ¶¶ 100, 101, 255. Once in Los Angeles, agents observed Defendant Green making what they

termed "burn runs"—erratic driving trying to detect surveillance. *Id.* at ¶ 99. Consequently, surveillance was terminated. *Id.* Surveillance alone continued to be unable to conclusively establish the sources of the drugs or the roles of every conspirator. *Id.* at ¶¶ 194–96. Continued surveillance had also jeopardized the investigation, especially with the growing suspicions of Defendant Green. *Id.* at ¶¶ 213, 254–56.

#### (b.) QUESTIONING AND INTERROGATION OF WITNESSES OR PARTICIPANTS

Information about new potential witnesses and newly developed information about previously known individuals demonstrated that these persons were likely to refuse or did refuse to provide information about Defendant Small's operations to authorities. Gov't Ex. 3B ¶¶ 72, 74, 84, 101, 213–19. Specifically, the Affidavit described communications where Defendant Small and Timothy Chandler discussed the recent arrest of Ronald Clark. *Id.* at ¶¶ 72–73. After Defendant Small expressed concern that Clark would inform investigators about Small's drug trafficking, Chandler, who is Clark's nephew, assured Defendant Small that his uncle would not talk to investigators. *Id.* Beyond those already described, there were no other known witnesses who could be safely approached for questioning. *Id.* at ¶ 224.

#### (c.) SEARCH WARRANTS

No new locations evidenced sufficient probable cause to be searched. Gov't Ex. 3B ¶¶ 234, 237. Accordingly, this Affidavit, and the previous Affidavits incorporated by reference, sufficiently demonstrated that search warrants were unlikely to advance the investigation.

#### (d.) INFILTRATION AND INFORMANTS

The Affidavit for the second extension sufficiently described why successfully using undercover agents and additional confidential informants remained unlikely. Gov't Ex. 3B ¶¶ 221, 223, 224.

#### (e.) PEN REGISTERS OR TRAP-AND-TRACE DEVICES

Finally, this Affidavit indicated that pen register, trap-and-trace, and toll information was subject to the same limitations noted in the other Applications and Affidavits and did not reveal the information that investigators needed to further their objectives. Gov't Ex. 3B ¶¶ 240, 242, 243.

#### 6. CONCLUSIONS REGARDING NECESSITY

My separate review of each Application and Affidavit results in one conclusion; the Government satisfied Title III's necessity requirement. 18 U.S.C. §§ 2518(1)(c) and (3)(c). The Affidavits described the traditional investigative techniques that had been tried against Defendant Small and his Organization, why they had failed and, if they had not been tried, the Affidavits explained with particularity why any such untried techniques would be either unsuccessful or too dangerous.

■■■■■ Defendants' argument that Judge Weinshienk should not have exercised her discretion and concluded that the First Wiretap was necessary is also unfounded. They claim that traditional investigative techniques had been successful and investigators' decision to not use an undercover agent or develop another confidential informant is fatal to Judge Weinshienk's conclusion that the First Wiretap was necessary. However, Congress did not require the exhaustion of "specific" or "all possible" traditional investigative techniques before a wiretap may be authorized. *United States v. Daly,* 535 F.2d 434, 438 (8th Cir.1976). Nor must traditional investigative techniques have been completely unsuccessful. *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977). Rather, 18 U.S.C. § 2518 is "simply designed to

assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), and that the statute safeguards against wiretapping "procedures (being) routinely employed as the initial step in criminal investigation." *Giordano,* 416 U.S. at 515, 94 S.Ct. 1820. I am convinced that the wiretaps here were not "employed as the initial step in the investigation." The Affidavits explained that other techniques were used first and that these other techniques failed to yield certain information concerning the Organization. Since the Government is not required to use a wiretap only as a last resort, it was not necessary that the Government explain away all possible alternative techniques. Thus, there is no basis for me to find that Judge Weinshienk abused her discretion when she concluded that this wiretap was "necessary" and, based on my own review of the Applications and Affidavits, I also conclude that the wiretaps were "necessary."

While Defendants have made great efforts to demonstrate how the investigation of Defendant Small could have been handled differently, the fact that Agent Wilcox and the MGTF could have taken additional or different steps in their investigation does not undermine the necessity finding in this case. *Carneiro,* 861 F.2d at 1178; *Carrillo,* 123 F.Supp.2d at 1245. I agree with other courts that have given these "[a]fter-the-fact suggestions by defense attorneys" little weight in determining statutory compliance with § 2518(1)(c). *Carrillo,* 123 F.Supp.2d at 1245; *accord United States v. Webster,* 734 F.2d 1048, 1055 (5th Cir.1984) (fact that counsel on appeal could list conceivable techniques for investigation is not dispositive; court will not invalidate a wiretap order because defense lawyers are able to suggest post factum some investigative technique that might have

been used but was not); *United States v. Feldman,* 535 F.2d 1175, 1178 (9th Cir. 1976) (even though defendant suggests ways in which surveillance and infiltration might have worked she is not entitled to second-guess FBI by suggesting alternatives reasonably discarded as not feasible by those conducting investigation).

I find that the Government has set forth in detail which normal investigative techniques have been tried and failed, and, if they have not been tried, explained with particularity why each such untried technique would be either unsuccessful or too dangerous. 18 U.S.C. § 2518(1)(c). Accordingly, and under either standard of review as discussed *supra,* I conclude that necessity has been demonstrated in this case. 18 U.S.C. § 2518(3)(c).

## V. SUBFACIAL CHALLENGES TO THE AFFIDAVITS UNDER *FRANKS V. DELAWARE*

The Tenth Circuit has held that where, as here, a defendant seeks to penetrate the Affidavit and assert a subfacial challenge to its truth on the grounds that the Affidavit used to secure the wiretap Order contained material misstatements or omissions of fact, the challenge proceeds under the framework for evaluating search warrants established by the Supreme Court in *Franks v. Delaware. Ramirez–Encarnacion,* 291 F.3d at 1223–24; *Green,* 175 F.3d at 828. Under *Franks,* a defendant is entitled to a hearing if he makes a substantial preliminary showing that a "false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. In the event a hearing is held, the Defendant must establish, by a preponderance of evidence, that the misstatements in question

were made intentionally or with reckless disregard for the truth and that, with the false statement omitted, probable cause was lacking.[6] *Id.* at 156, 98 S.Ct. 2674. The Tenth Circuit has recognized that the *Franks* analysis applies not only to probable cause determinations but also as to whether "necessity" has been demonstrated in a given case. *Ramirez–Encarnacion*, 291 F.3d at 1223–24; *Green*, 175 F.3d at 828.

Although the *Franks* decision did not define "reckless disregard for the truth," the Tenth Circuit has indicated that "reckless disregard for the truth" occurred when "the affiant in fact entertained serious doubts as to the truth of his allegations." *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir.1991) (internal citations omitted); *accord United States v. Clapp*, 46 F.3d 795, 800 (8th Cir.1995) ("Courts, including our own, that have attempted to define reckless disregard for the truth have looked to what the affiant, 'believed or appropriately accepted' as true"). In addition, "[r]ecklessness may be inferred from the omission of facts which are clearly critical" to the findings of the issuing judge. *Bruning*, 949 F.2d at 357; *see Carrillo*, 123 F.Supp.2d at 1252.

Finally, if a Defendant establishes by a preponderance of the evidence that the omissions or misstatements were made intentionally or with a reckless disregard for the truth, a reviewing court must engage in a "critical final step" to actually effect the suppression of evidence. *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir.1995) The reviewing court must formally weigh whether the wiretap application, "corrected for any false statements and omissions, is sufficient to show probable cause" or necessity. *Id.*; *accord, Green*, 175 F.3d at 828.

In this case, I conducted two separate evidentiary hearings, the first lasting four days and the second for one day. Although I did not conclude that the Defendants satisfied the threshold to compel a *Franks* hearing, the evidentiary hearings in this case provided ample opportunity for the Defendants to address all *Franks* type issues. Defendants were given the opportunity to cross-examine both Agent Wilcox and CS–1 regarding any purported misstatements or omissions in the wiretap Applications and Affidavits.

Defendants argue the Affidavits in support of the Applications contain material false statements and omissions that negate a necessity and probable cause finding. The majority of the alleged omissions and representations involve the Affidavit for the First Wiretap and relate to the following issues: (1) the profits and drug volumes attributed to Defendant Small's Organization; (2) the ability of police to introduce another informant or undercover officer to Defendant Small, and the use of Club Mixx for an undercover introduction; (3) the actual harm or physical danger to CS–1; (4) the attributes of CS–1 and her cooperation; and (5) certain information obtained during the pre-wiretap investigation. To the extent Defendants also claim the Affidavit for the Second Wiretap and the Affidavits submitted for the three extension Orders contain misrepresentations and omissions, those mistakes relate to: (1) the profits and drug volumes attributed to Defendant Small's Organization; and (2) the identification of a potential crack cocaine supplier for Defendant Small's Organization. Defendants assert these omissions and misrepresentations warrant suppression of the

---

**6.** Further, Tenth Circuit decisions have extended the holding of *Franks* to cover both misstatements and material omissions from the affidavits. *Green*, 175 F.3d at 828; *see Stewart v. Donges,* 915 F.2d 572, 583 n. 13 (10th Cir.1990).

evidence derived from all of the wire-taps. The persuasiveness of each of those misrepresentations and omissions is addressed below.

### A. THE AFFIDAVIT FOR THE FIRST WIRE-TAP

### 1. THE ALLEGED PROFITS AND DRUG QUANTITIES OF THE WILLIE SMALL DRUG DISTRIBUTION ORGANIZATION

█ Defendants first contend that Agent Wilcox knowingly misrepresented the extent and value of Defendant Small's drug operations to Judge Weinshienk. Specifically, Defendants allege that Agent Wilcox intentionally or with a reckless disregard for the truth stated in the First Affidavit that:

It is your affiant's belief that the WIL-LIE SMALL drug distribution [sic] is a valid target for a wiretap based in part on SMALL's conversation with CS–1 on October 30, 2000. During that conversation, SMALL said that he made $18,000 profit per week selling crack cocaine. This amount totals $72,000 per month or $864,000 per year. The figure also represent the distribution of at least five (5) kilograms [sic] crack cocaine per month or sixty (60) kilograms of crack cocaine per year.

Gov't Ex. 1B ¶ 225. Defendants claim that Agent Wilcox inserted the inflated profit and distribution figures in an effort to convince Judge Weinshienk that Defendant Small's Organization was a multimillion dollar operation. Gov't Ex. 1E, p. 6. Had Agent Wilcox accurately represented the size and scope of the Organization to Judge Weinshienk, Defendants argue, she would not have concluded that the First

Wiretap was necessary or that probable cause had been demonstrated.

Defendants' argument is flawed because the evidence presented at the wiretap hearings indicated that Agent Wilcox was, at most, negligent or committed an innocent mistake by including the $18,000 figure in the First Affidavit. Agent Wilcox testified that he derived the $18,000 sum from a conversation recorded during CS–1's controlled purchase of crack from Defendant Small on October 30, 2000. (Transcript ("Tr.") of March 11, 2002, at 127, 164). He arrived at the $18,000 figure after listening to the conversation as it occurred, after reviewing a recorded tape of the conversation and after debriefing CS–1 immediately following the controlled purchase. (*Id.*)

In February 2002, after the Defendants filed the motions to suppress presently before the Court, Agent Wilcox reviewed a transcript of the conversation between CS–1 and Defendant Small during that controlled buy and listened to the tape recording made of that conversation. (*Id.* at 165). As a result of his review of those materials, Agent Wilcox admitted during *direct* examination at the March 11, 2002, hearing, that he was mistaken in his initial interpretation of the conversation between CS–1 and Defendant Small. (*Id.* at 119). Agent Wilcox testified that Defendant Small actually stated on the tape, "if I do 18 a week, you know, I'm going to come out with seven grand." [7] (*Id.*)

Subsequent to the first set of hearings on the wiretaps, Defendants requested a hearing to cross-examine CS–1 regarding Agent Wilcox's testimony. Although I found Agent Wilcox's explanation at the

---

**7.** Though Defendants allege that Defendant Small's recorded words were "perfectly clear," this Court, having itself listened to the recording during the evidentiary hearing, wonders if the Defendants might have heard a

different recording when classifying Defendant Small's speech as "perfectly clear." The recording played before this Court proved Defendant Small's statements to be well-nigh incomprehensible.

first set of hearings credible, I granted the Defendants' request to cross-examine CS–1 because certain critical information known only to CS–1 was "relevant to the Court's analysis as to whether the affidavits contained false statements or statements made with reckless disregard for the truth." *See* Court's Order filed May 10, 2002. However, at the June 12, 2002, hearing where CS–1 testified, defense counsel were unable to elicit testimony from CS–1 that contradicted Agent Wilcox's explanation or his understanding of the recorded conversation.[8]

As stated previously, I find that the Defendants did not make a substantial preliminary showing and, after listening to five days of testimony and carefully considering the Defendants' arguments, I find that Defendants did not demonstrate by a preponderance of the evidence that Agent Wilcox intentionally misrepresented the Organization's profits and drug volumes or that he "entertained serious doubts as to the truth of his allegations." The evidence demonstrates, at most, that Agent Wilcox was negligent or committed an innocent mistake, which is not enough to satisfy Defendants' burden under *Franks*, 438 U.S. at 171, 98 S.Ct. 2674.

Even assuming that the misstatement concerning profits and drug volumes was knowingly or recklessly made, I do not find that it is in any way material, as Defendants contend, or would have any effect upon a probable cause or necessity finding if removed from the First Affidavit. A statement regarding the size and the scope of Defendant Small's Organization, whether it is grossly inflated or the unqualified truth, is unrelated to a court's "necessity" analysis. The "necessity" requirement mandates that the Government demonstrate, and the issuing judge conclude, that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous. 18 U.S.C. §§ 2518(1)(c) and (3)(c). Absent from the statute is any requirement that the applicant describe the size and scope of the criminal operation or that the issuing judge conclude that the conspiracy is of sufficient size and scope to warrant the issuance of a wiretap. The purported profits and drug quantities mistakenly attributed to the Organization, or even the corrected values, are irrelevant to a necessity showing and finding. As such, even if I stripped the First Affidavit

---

**8.** As a result of the testimony at the June 12, 2002, hearing, defense counsel assert that CS–1 did not know the meaning of Defendant Small's statement on October 30, 2000, when she met with Agent Wilcox. *See* Defs.' Consol. Submission Re: Effect of CS–1's June 12, 2002, Testimony on Defs.' Various Motions to Suppress filed June 28, 2002 ("Defendants' Consolidated Submission Regarding CS–1") at 5–6. However, CS–1's testimony at the June 12, 2002, hearing, contradicts Defendants' assertions. CS–1 testified that she could not *presently* remember whether she once interpreted Defendant Small's statements to mean that he earned $18,000 per week. (Tr. of June 12, 2002, at 31–32). She attributed her inability to recall the specific matters discussed with Agent Wilcox on October 30, 2000, to the significant time that has elapsed since that meeting. Contrary to De-

fendants' arguments, she did not admit that on October 30, 2000, she did not know the meaning of Small's statement, only that as of June 12, 2002, she could not remember her previous interpretation of '18 a week.' Although the Government offered to present two individuals—Aurora Police officers Laurie Michelson and Gary Valko—who were witnesses to CS–1's conversation with Agent Wilcox to buttress the fact that CS–1 agreed with Agent Wilcox's interpretation, I concluded that such testimony was unnecessary. Further, I will GRANT Defendant Timothy Chandler's Motion to Strike Exhibits 1 and 2, the Affidavits of Laurie Michelson and Gary Valko From the Government's Supplement to Response to Defendants' Request for Suppression of Wiretap Evidence filed August 12, 2002.

of all references to the $18,000 figure and its extrapolations, I could not conclude that the corrections would vitiate the necessity findings in this case.

The inclusion of the inflated profit and drug volume figures in the First Affidavit is also irrelevant to a probable cause finding. The probable cause required for the issuance of a wiretap order is the belief that a particular offense enumerated in § 2516 has been, is being, or is about to be committed, and that conversations related to the offense will be overheard. 18 U.S.C. §§ 2518(3)(a), (b) and (d); *Armendariz*, 922 F.2d at 608. Again, performing the "final critical step" and removing the inflated figures, the First Affidavit still demonstrates probable cause for the issuance of the First Wiretap. The First Affidavit represented the exact amounts of crack cocaine, up to two ounces, and the amount of money paid when CS–1 made controlled buys from Defendant Small. *See* Gov't Ex. 1B, ¶¶ 25, 28–30, 32–34, 36, 37, 52, 54, 58, 59, 66, 67, 71, 76, 78, 83, 86, 88, 89, 98, 100, and 102.

The Affidavit detailed information from CS–1 that Defendant Small sold drugs to a large number of people in the Denver area. *See* Gov't Ex. 1B ¶ 17. The Affidavit also described Defendant Small's use of his cellular telephone to arrange drug transactions with CS–1. *Id.* at ¶¶ 26, 27, 31, 35, 53, 60, 68, 77, 87, 99. Therefore, irrespective of the inflated figures, the corroborated and unchallenged evidence associated with the controlled buys established probable cause that a particular offense enumerated in § 2516 has been, is being, or is about to be committed, and that conversations related to the offense will be overheard. 18 U.S.C. §§ 2518(3)(a), (b) and (d).

■ Finally, Defendants make much of the fact that Judge Weinshienk believed that this conspiracy involved "literally millions of dollars." *See* Gov't Ex. 1E, p. 6. But, as set forth above, for the purposes of my *Franks* analysis her mistaken observations regarding the size and scope of the Organization do not vitiate or negate the probable cause and necessity findings that existed. I find that the size and scope of a criminal operation are not the *sine qua non* of an issuing judge's calculus when evaluating the merits of a wiretap Application.[9] The issuing judge in the first instance and the district court upon review are only concerned with statutory mandates and not whether a criminal operation is of sufficient size and scope to warrant a wiretap. Accordingly, I conclude that the alleged misstatements regarding the size and scope of the Organization do not negate the conclusion that the Government satisfied the necessity and probable cause requirements for the issuance of the First Wiretap.[10]

**9.** A wiretap Order is an investigative method used by the executive branch, not an element of the judicial process. *See United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (discussing the history of wiretapping regulation). Case law and the plain language of the statute provide that the Attorney General and others with specially delegated authority may authorize applications for a wiretap. 18 U.S.C. § 2516; *United States v. Chavez*, 416 U.S. 562, 572, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Those are the individuals who decide whether a particular case merits the expenditure of time and re-

sources required to investigate a criminal organization with a Title III wire interception.

**10.** Defendants also raised an objection to the fact that Defendant Small's 1992 Mercedes, priced new at $93,000, was represented in the Affidavit at its "sticker price" without also noting that Small had bought the car used. For the same reasons that the profitability of Defendant Small's drug organization is immaterial to the issues of necessity, so too is this omission regarding the value of the car when Defendant Small purchased it.

2. **INTRODUCTION OF AN UNDERCOVER OFFICER OR ANOTHER CONFIDENTIAL INFORMANT AND THE INFILTRATION OF CLUB MIXX.**

Defendants next argue that testimony by CS–1 at the June 12, 2002, hearing demonstrates that law enforcement officials generally were better capable of introducing undercover agents or informants, or both, than was represented to Judge Weinshienk in the Affidavit for the First Wiretap. Specifically, Defendants believe the Government exaggerated its inability to: (1) introduce undercover agents at Club Mixx; (2) "flip" Defendant Small and make him a Government informant; and (3) compel CS–1 to introduce additional undercover agents, informants, or both, to Defendant Small.

As to the Government's inability to introduce an undercover agent at Club Mixx, the Defendants claim Agent Wilcox improperly and incorrectly portrayed Club Mixx to Judge Weinshienk as a "dangerous criminal infested bar and unsuitable for an undercover introduction." *See* Defendants' Consolidated Submission Regarding CS–1 at 14, 18. However, the First Affidavit does not describe Club Mixx in this manner and the Affidavit does not indicate that Club Mixx was too dangerous for an undercover introduction. In fact, Agent Wilcox testified at the March 12, 2002, hearing that he did not "discuss anything with [Judge Weinshienk] regarding the introduction of an undercover officer at Club Mixx." (Tr. of March 12, 2002, at 349).

In actuality, the First Affidavit only generically refers to placing an undercover officer at "business locations," presumably Club Mixx, where Defendant Small or other named interceptees were believed to be working. *See* Gov't Ex. 1B ¶ 274. The First Affidavit further provided that Agent Wilcox rejected this consideration because it was unlikely to result in a narcotics relationship, Defendant Small did not like meeting new people and any evidenced obtained would be duplicative of evidence previously gathered by CS–1. *Id.*

Accordingly, Defendants' argument is not that Agent Wilcox misrepresented the dangerousness of Club Mixx but that he omitted information that Club Mixx was a viable location for an undercover introduction. In furtherance of that argument, Defendants directed the Court to CS–1's statement that Club Mixx was one of the three nicest African–American nightclubs in Denver, Colorado. (Tr. of June 12, 2002, at 62–63). However, the factual statements regarding Club Mixx that the Defendants would have me insert in the First Affidavit to correct this alleged omission are not supported by the record. Agent Wilcox testified at the suppression hearing that he rejected placing an undercover officer at Club Mixx for numerous reasons but primarily because he could not ensure an undercover agent's safety in the Club. (Tr. of March 13, 2002, at 722–28). He also vehemently disagreed with defense counsel's assertion that Club Mix was a safe location to place an undercover officer. (*Id.*)

I find the reasoning in *United States v. Mancari*, 663 F.Supp. 1343 (N.D.Ill.1987), compelling in the present case:

> The decision whether to employ an undercover agent is a judgment which must be based on a current assessment of the circumstances and an expertise in law enforcement gleaned from practical experience. This court does not have the latter and, realistically, is probably unable to completely comprehend the former. Given that, decisions which involve the personal security of those assisting the government must be accorded great deference.

663 F.Supp. at 1349. Similarly, I refuse to second-guess Agent Wilcox's assessment of

the dangerousness of Club Mixx. It is axiomatic that the Government did not have to unnecessarily risk agents' safety in its investigation of Defendant Small's Organization before seeking the First Wiretap.

Moreover, Defendants' allegations of what investigating agents *might* have done or *could* have done during the investigation is not material to a necessity finding. After the fact suggestions as to how the Government should have handled its investigation do not invalidate Judge Weinshienk's necessity finding. This type of *post hoc* rationalizing by the Defendants is entitled to little weight in the analysis of statutory compliance with § 2518(1)(c) and would clearly not vitiate the necessity finding in this case. *Carrillo,* 123 F.Supp.2d at 1245; *see United States v. Crumpton,* 54 F.Supp.2d 986, 1008–09 (D.Colo.1999).

 Next, the Defendants contend that the Government materially misstated its ability to "flip" Defendant Small—that is, to make Defendant Small an informant himself. The Defendants assert that Agent Wilcox's explanation for this failure to use Defendant Small—which Agent Wilcox ascribed to Defendant Small's numerous previous felonies and his parole status at the time—was inconsistent with the Government's employment of CS–1, who, like Defendant Small, had a robust criminal history.

I disagree with the thrust of this argument. Defendant Small was the target of this investigation. He had six previous felony convictions and was conducting his Organization while on parole. The goal of this investigation was not to convert him to an informant. It is also not apparent to me how CS–1's employment as an informant refutes Agent Wilcox's stated belief that Defendant Small would be unhelpful as a witness against his own sources. Accordingly, I conclude that Defendants did not make a substantial showing that Agent Wilcox intentionally or recklessly included false statements in the First Affidavit regarding the Government's ability to "flip" Defendant Small.

 Finally, Defendants argue that the First Affidavit misrepresents CS–1's inability to introduce undercover agents or additional informants to Defendant Small.[11] In her testimony, CS–1 admitted that it might have been possible to introduce an undercover agent to Defendant Small.[12] (Tr. of June 12, 2002, at 68–71). However, when the Government asked CS–1 to do so during the investigation, she refused steadfastly. (*Id.*) Defendants do not contest that CS–1 refused the Government's request. Instead, they contend the Government "rolled over" too easily when CS–1 refused. However, pursuant to *Castillo–Garcia* and the additional authority

---

11. But as the Government correctly points out, "[l]aw enforcement *does not ever* attempt to have one informant introduce another informant to a target." United States' Supplement to Response to Defendants' Request for Suppression of Wiretap Evidence, at 7 n. 4 (emphasis in original). The reason for this is quite obvious: if an informant already is operating successfully, then there is no advantage gained—and risk is incurred—by having a second informant who is less familiar with the target also making controlled buys. Thus, the only relevant contention is that the Affidavits misrepresent CS–1's inability to introduce undercover officers to Defendant Small.

12. This is reflected in the dialogue between the Court and CS–1:

> THE COURT: [L]et me ask you just this. Let's assume for purposes of my question that there was an undercover officer that you wanted to introduce to Mr. Small. Can you think of ways in which you could have made that happen if you had opted to do that?
>
> THE WITNESS: Anything can happen, yeah, there would have been ways it could have been done, but I just didn't feel comfortable doing it.

(Tr. of June 12, 2002, p. 70).

cited *supra*, the Government has met its burden in explaining why it was unable to introduce undercover agents.

Further, CS–1 *did* testify that Defendant Small expressed reluctance to engage in drug transactions with strangers; she stated that Defendant Small "didn't want to know a lot of people that he didn't already deal with, that he didn't already know; and I didn't feel comfortable introducing an undercover officer to him." (Tr. of June 12, 2002, at 70). Defendants did not make a substantial preliminary showing, and even assuming they did, the evidence at the hearings clearly demonstrated that the First Affidavit accurately reflected CS–1's inability to introduce undercover agents or additional informants to Defendant Small. Thus, the Defendants did not make the requisite showing under *Franks* by a substantial showing or by a preponderance of the evidence.

### 3. THE ACTUAL HARM OR PHYSICAL DANGER TO CS–1

 Defendants next question whether Agent Wilcox accurately portrayed the threat of actual harm or physical danger to CS–1 by Defendant Small or his associates in the First Affidavit and during the *in camera* hearing before Judge Weinshienk. *See* Gov't Ex. 1B ¶ 257; Ex. 1E, p. 10–11. The crux of Defendants' objection is that CS–1 was prematurely relieved of her informant duties due to what they consider a specious, nonexistent threat of harm from Defendant Small.

While CS–1 denied having received a specific threat of actual harm from Defendant Small or his associates during the time she was an informant, she also indicated she had significant general fear that someone, *including* Defendant Small and his associates, might seek to harm her if they discovered she was an informant. (Tr. of June 12, 2002, at 19–20). Indeed, so great was CS–1's concern about possi-

ble recriminations or harm that she was the one to initiate a discussion of the topic with Government agents. (*Id.*) Consequently, I do not find that Defendants have satisfied their burden under *Franks*. In addition, I conclude that CS–1's testimony is not sufficiently antithetical to Agent Wilcox's statements to render the statements to Judge Weinshienk, and as set forth in the First Affidavit, intentional misrepresentations or statements made with a reckless disregard for the truth.

### 4. THE ATTRIBUTES OF CS–1 AND HER COOPERATION

 Defendants also note that CS–1's checkered criminal past, which includes multiple felony convictions, was not disclosed to Judge Weinshienk. Defendants claim that Agent Wilcox failed to disclose information to Judge Weinshienk that would show that CS–1 was a " 'superstar' within the drug subculture that could have been used far more effectively and extensively in this investigation." *See* Defendants' Consolidated Submission Regarding CS–1, p. 16. Defendants contend that these omissions were material and would vitiate a probable cause and necessity finding if they had been disclosed to Judge Weinshienk.

Here, the First Affidavit clearly informed Judge Weinshienk that CS–1 was seeking leniency on several pending criminal charges in exchange for her cooperation. *See* Gov't Ex. 1B ¶¶ 15–16. However, Defendants claim that Agent Wilcox omitted information pertaining to her prior use of aliases, the duration of her potential sentence and that CS–1 was paid for her work in this case. They contend that including this information in the First Affidavit would cast doubt upon the veracity of CS–1's statements, which Agent Wilcox relied upon in demonstrating necessity.

I disagree with Defendants' conclusion because the veracity of CS–1's statements is not at issue here. Defendants' burden is to present substantial evidence of deliberate or reckless falsity on the part of Agent Wilcox, not CS–1. *United States v. Hernandez*, 829 F.2d 988, 992 (10th Cir.1987). Defendants' allegations concerning CS–1's truthfulness are not relevant to my *Franks* analysis. *Id.* These allegations do not involve statements of Agent Wilcox, and would not entitle Defendants to a *Franks* hearing. *Id.*

Further, even assuming that Agent Wilcox recklessly omitted this information, I find that it was not material to a probable cause or necessity finding. As to probable cause, the Tenth Circuit recently noted that when evaluating the significance of information related to an informant's credibility, a court must "ask whether, assuming the [judge] had been apprised of the omitted information, the judge still 'would have found probable cause[.]' " *United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir.2002) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir.1997)). "[Judges], courts have observed, often know, even without an explicit discussion of criminal history, that many confidential informants 'suffer from general unsavory character' and may only be assisting police to avoid prosecution for their own crimes." *Id.* (quoting *United States v. Novaton*, 271 F.3d 968, 985 (11th Cir.2001)).

But even if this recent pronouncement by the Tenth Circuit were not sufficient to dismiss Defendants' argument, I incorporate herein my discussion *supra* of law enforcement agents' independent, carefully detailed corroboration of CS–1's controlled purchases. Indeed, CS–1 was searched, taped, and monitored during each of the controlled buys, drug quantities were precisely weighed, and recorded conversations were reviewed by multiple agents and CS–1 together. *Avery* states that even if an informant's veracity is questionable because of a substantial criminal record, probable cause exists whenever there is reliable independent verification of relevant details. 295 F.3d at 1168–69.

The alleged omissions were also immaterial to a necessity finding. I disagree with Defendants assertions that *United States v. Ippolito*, 774 F.2d 1482 (9th Cir.1985), is apposite to this case. *Ippolito* involved a deliberate attempt by an FBI agent to mislead the authorizing court respecting the necessity of electronic surveillance. *Id.* at 1483. Specifically, the agent told the court that "the confidential informants ... have all stated they would not testify regarding the information they furnished ... because they fear retaliation to themselves or their families." *Id.* As it turned out, however, the real reason the confidential informant made that statement is because the agent told him to do so in the hopes of bolstering the wiretap application's necessity showing. *Id.*

The testimony at the June 12, 2002, hearing demonstrates that *Ippolito* is factually dissimilar to the case at bar. CS–1's testimony at that hearing corroborated both the contents of the First Affidavit and Agent Wilcox's testimony at the first suppression hearings. Moreover, I had the opportunity to assess CS–1's credibility during that hearing. I found her statements to be credible and consistent with the main points asserted by Agent Wilcox in the First Affidavit. Accordingly, there is no basis to suppress evidence under *Franks* due to the omission of CS–1's criminal history from the First Affidavit.

### 5. INFORMATION OBTAINED DURING THE PRE-WIRETAP INVESTIGATION

Agent Wilcox also allegedly omitted or misrepresented certain information from the pre-wiretap investigation because

he wanted to persuade Judge Weinshienk that Defendant Small's Organization "was a worthy target for a wiretap and that a wiretap was, in fact, necessary." *See* Defendants' Joint Proposed Findings of Fact and Conclusions of Law Regarding Motions to Suppress Wiretaps and Extensions ("Defs.' Joint Findings of Fact and Conclusions of Law") filed April 15, 2002, p. 41. Had the First Affidavit revealed the true nature of the pre-wiretap investigation, Defendants argue that Judge Weinshienk would not have found that resort to a wiretap was necessary.

I have undertaken a thorough review of Defendants objections and conclude that they are not supported by the record and evidence. First, Defendants state that the Affidavit omitted the results of asset searches involving Defendant Small. That statement is false. The First Affidavit mentions the only result of an asset search involving Defendant Small, the information relating to his Mercedes Benz. Next, they claim that Defendants Small, Keyonna Davis and Dachaun Davis are not blood relatives as Agent Wilcox represented in the First Affidavit. Defendants claim he misrepresented their relatedness to buttress his depiction of the Organization as a close knit, family run, drug trafficking enterprise. This claim is specious too. Agent Wilcox informed Judge Weinshienk at the first *in camera* hearing that Defendant Small referred to Dachaun and Keyonna Davis as his 'son' and 'daughter,' but he did not specifically know how they were related. *See* Gov't Ex. 1E, p. 13. The record is replete with instances where Defendant Small referred to Dachaun and Keyonna Davis as his son and daughter, which clearly corroborates Agent Wilcox's characterization of their relationship. *See, e.g.,* Gov't Ex 1B ¶¶ 35, 70, 80, 87, 88. Accordingly, Defendants failed to demonstrate that this misrepresentation was made intentionally or recklessly or that it was material to the necessity finding.

Next, Defendants allege that the First Affidavit misrepresented the success of the pen register and trap and trace devices during the pre-wiretap investigation. They speculate that Agent Wilcox deliberately understated this aspect of the pre-wiretap investigation to support his claim that the wiretap was necessary. A review of the record, however, does not support such an inference. Agent Wilcox testified that subscriber information obtained from the pen register and trap and trace data consisted of "thousands" of names. (Tr. of March 11, 2002, at 30–32; Tr. of March 12, 2002, at 338–41). Efforts were made to identify the telephone numbers that called or were called by Defendant Small's telephones with the most frequency. (Tr. of March 12, 2002, at 338–41). Investigators would then perform criminal history checks and record checks on the subscribers' information for those telephone numbers. (*Id.* at 339).

With the benefit of hindsight, Defendants make much of the fact that "telephone numbers associated with Theolian Lloyd appeared on the pen register ... 225 times" before March 28, 2001. *See* Defs.' Joint Findings of Fact and Conclusions of Law, p. 16. Rather than demonstrating that the Government was excluding positive results of the pre-wiretap investigation, Defendant Lloyd's appearance on the pen registers and trap and trace devices illustrates the limited usefulness of those devices. Agent Wilcox testified that the vast majority of the 225 calls originated from a telephone subscribed to "G. Keith." (Tr. of March 12, 2002, at 429). He further testified that investigators *presently* know that G. Keith was a "female associate or wife" of Defendant Lloyd but this information was not known when the Government applied for the First Wiretap on March 28, 2001. (*Id.* at 429–31). In fact, traditional investigative methods could not

conclusively identify the individual or individuals using the telephones subscribed to G. Keith and Defendant Lloyd. (*Id.*)

Although Defendants have not demonstrated that Agent Wilcox omitted this information intentionally or with a reckless disregard for the truth, including this information in the First Affidavit does not vitiate the necessity finding. The information obtained from the pen registers and trap and trace devices was inconclusive at best. In determining whether the Government has satisfied the necessity requirement, I must use a "practical and common sense approach," applying a "standard of reasonableness." *Ippolito*, 774 F.2d at 1486. The "necessity" requirement does not mandate that the Government disclose to an issuing judge every minute detail of an investigation or every conceivable lead not followed. The Government "need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping." *Castillo-Garcia*, 117 F.3d at 1187. My inquiry must focus on what investigators knew at the time they applied for the First Wiretap, not the knowledge that is available at the present time. Accordingly, I find that the omission of information with questionable relevance was clearly not material to a necessity finding.

### 6. CONCLUSION REGARDING *FRANKS* ANALYSIS AND THE FIRST WIRETAP

Individually, the above mentioned misrepresentations and omissions would not be material to a necessity finding. But the question remains whether the large number of alleged misrepresentations and omissions is amenable to piecemeal analysis. In an abundance of caution and without clear authority indicating otherwise, I find that it is also proper to view the alleged misrepresentations and omissions in their totality to determine if they would be material to, and negate, a necessity or a probable cause finding.

Viewing the alleged misrepresentations and omissions in the First Affidavit together, I conclude that the Government has not engaged in a deliberate attempt to mislead the Court and subvert the purposes of 18 U.S.C. § 2518. This is not a case where the Government failed to reveal the success of the pre-wiretap investigation. The First Affidavit sets forth in detail the results of the pre-wiretap investigation and why that evidence or the pursuit of additional evidence via traditional investigative techniques would not "make the case." Further, I had an opportunity to observe the demeanor of Agent Wilcox during his lengthy testimony and assess his credibility. Agent Wilcox made no effort to conceal the truth and I find his testimony credible.

With the benefit of hindsight, Defendant Small's Organization was not making $18,000 a week as Agent Wilcox once believed. At the same time, this was not a "Mom and Pop" drug organization or a "corner drugstore outlet" as one defense counsel analogized during the wiretap hearings. (Tr. of March 14, 2002, at 830–31). The record reflects that Defendant Small, both before and after the commencement of the First Wiretap, was a large scale distributor of crack cocaine. Whether a wiretap is necessary is determined by the success of traditional investigative techniques, not the size and scope of the criminal enterprise.

There is no doubt that Defendants have identified some information that was not included in the First Affidavit. Despite their accusations to the contrary, Defendants have not demonstrated that Agent Wilcox failed to include this information because of an intent to misrepresent the facts or mislead Judge Weinshienk. The alleged misrepresentations and omis-

sions—analyzed separately or in their totality—would not negate the necessity and probable cause for the First Wiretap. Thus, I conclude there is no basis to suppress evidence from the First Wiretap under *Franks v. Delaware.*

### B. THE AFFIDAVIT FOR THE SECOND WIRETAP AND THE AFFIDAVITS FOR THE EXTENSIONS TO THE FIRST AND SECOND WIRETAP

Defendants claim that the Affidavit for the Second Wiretap contains material misrepresentations and omissions that relate to the profits and drug volumes attributed to Defendant Small's Organization and a potential crack cocaine supplier for Defendant Small's Organization. As to the inflated profit and drug volumes, Defendants claim that it was an intentional misrepresentation to include in the Second Affidavit the $18,000 profit figure and Agent Wilcox's extrapolations when the evidence obtained during the interceptions on the First Wiretap did not support the inflated figures. Defendants also argue that Agent Wilcox buttressed these exaggerated profit figures by intentionally misleading Judge Weinshienk during the *in camera* hearings. Defendants find fault with the following exchange between Judge Weinshienk and Agent Wilcox:

THE COURT: Although from reading the [the Affidavit for the Second Wiretap] you've obtained a tremendous amount of information on the first telephone, the target one telephone.

AGENT WILCOX: Yes. He's selling an extraordinary amount of narcotics.

Gov't Ex. 4D, p. 2.

The Government indicated at the suppression hearing that they identified sales by Defendant Small totaling approximately 550 grams of crack cocaine during the interception period for the First Wiretap. Defendants claim that Agent Wilcox should have corrected his extrapolated figures to accurately reflect the actual sales of narcotics observed by investigators or, at a minimum, corrected Judge Weinshienk's belief regarding the size and scope of the conspiracy. And failing to make those corrections, they claim, constitutes an intentional misrepresentation that warrants suppression of the evidence derived from the Second Wiretap.

I disagree with Defendants' conclusion and find that the Defendants failed to demonstrate that Agent Wilcox made intentional misrepresentations or that he was "reckless" in this instance. To show reckless disregard for the truth, Defendants must prove that "the affiant in fact entertained serious doubts as to the truth of his allegations." *Bruning,* 949 F.2d at 357. Their attempt to show recklessness focused on Agent Wilcox's involvement in other drug investigations involving multi-kilogram distributors of cocaine. During cross-examination, Defendants attempted to demonstrate that Agent Wilcox could not consider the quantities of drugs in this case "extraordinary" because of his work in other drug cases. I conclude that defense counsel's efforts to prove that Agent Wilcox entertained any doubts that Defendant Small was selling an extraordinary amount of narcotics ultimately proved unsuccessful. Agent Wilcox testified that he believed Defendant Small was dealing an extraordinary amount of *crack* cocaine with disturbing frequency. (Tr. of March 12, 2002, at 280; Tr. of March 13, 2002, at 660–61, 678). In addition to the information obtained during the pre-wiretap investigation, he testified that between March 28 and April 20, 2001, Defendant Small appeared to conduct fifty-three drug transactions totaling approximately 550 grams of crack cocaine. (Tr. of March 12, 2002, at 279).

Defendants' efforts to compare the quantities of crack cocaine involved in the

case at bar with quantities of powder cocaine from Agent Wilcox's prior investigations were well-intentioned but misguided. As the Government correctly acknowledged in its brief filed with the Court, powder cocaine and cocaine base, commonly referred to as "crack," are different substances. This difference is recognized by Congress in Title 21 of the United States Code, the Comprehensive Drug Abuse Prevention Act. The federal sentencing guidelines equate one gram of crack to 100 grams of various forms of "cocaine," *i.e.,* it takes 100 times as much powder cocaine compared to crack to trigger the mandatory minimum penalties. *See* 21 U.S.C. § 841. Under the statute, trafficking in 5 grams of crack triggers a five-year mandatory minimum sentence, but if the defendant is trafficking in powder cocaine, the five-year mandatory minimum sentence is triggered only if the amount involved is 500 grams. 21 U.S.C. § 841(b)(1)(B). Similarly, trafficking in 50 grams of crack triggers a ten-year mandatory minimum, while trafficking in 5,000 grams of powder cocaine triggers the ten-year mandatory minimum. *See* 21 U.S.C. § 841(b)(1)(A). Thus, compared to prosecutions involving powder cocaine, relatively small quantity differences of crack produce profound differences in sentencing calculations. In this light, the statements from Agent Wilcox during the *in camera* hearing are not mere puffery. .

Although Agent Wilcox failed to *expressly* inform Judge Weinshienk that the total crack cocaine sales for this period were less than he predicted in the First Affidavit, his failure to do so was not material to the necessity finding. The Affidavit for the Second Wiretap reflects that the intercepted communications from the First Wiretap supported his belief that Defendant Small was dealing a substantial amount of crack cocaine. The Second Affidavit and the transcript from the *in camera* hearing before Judge Weinshienk accurately reflect, both the quantities of drugs that Defendant Small was distributing and that the volume of sales or money generated by the Organization was less than agents originally anticipated. I therefore conclude that these alleged misstatements or omissions do not negate the conclusion that the Second Wiretap satisfied the necessity requirement.

■ Defendants also claim that Affidavit for the Second Wiretap omits information relating to a potential drug supplier for Defendant Small's Organization, Douglas Dugar. Although investigators obtained the information concerning Dugar *before* Agent Wilcox applied for the Second Wiretap, this information was not included in the Affidavit for the Second Wiretap. *See* Gov't Ex. 2B ¶¶ 92, 98, 100, 102, 105, 130–33, 179–80. .

My review of the record does not support Defendants' contention. First, the Defendants' characterization of Dugar as a supplier for the Organization is misleading. The record reflects that investigators identified several telephone calls where Defendant Small discussed, in general terms, a potential supplier of crack cocaine. *Id.* Whether Dugar was in fact the supplier that Defendant Small referenced in these conversations is inconclusive. Even with both physical and electronic surveillance in place and after conducting a "stop and talk" with Dugar, agents were unable to conclusively determine whether Dugar was a supplier for the Organization, a purchaser of narcotics from Defendant Small or if Dugar even had a drug-related meeting with Defendant Small. *Id.*

The record also reflects that this omission was not intentional or reckless. All of the information cited by Defendants regarding Dugar was presented to Judge Weinshienk seven days later on April 27, 2001, when the Government submitted its Application for an extension Order for the

First Wiretap. Submitting the information about Dugar only a few days later hardly evinces the intent to mislead Judge Weinshienk that Defendants have ascribed to Agent Wilcox.

Agent Wilcox also testified that some information intercepted during the First Wiretap might not have been included in the Second Affidavit because of the delay associated with seeking Department of Justice ("DOJ") approval. (Tr. of March 11, at 65). He testified that approval from the DOJ can sometimes take three to six weeks. (*Id.*) Accordingly, he submitted the Second Wiretap Application and Affidavit to the DOJ for approval many days prior to April 20, 2001. Although agents attempted to update the Second Wiretap Application, it follows that some information obtained during the first 23 days would have been left out of the Second Affidavit.

■ Even if I infer recklessness from the omission of this information, the allegations pertaining to Dugar would not vitiate a necessity finding. Agent Wilcox testified that he attempted to use traditional investigative techniques to discern Dugar's role in this case but those efforts proved unsuccessful. (Tr. of March 13, 2001, at 760–61). Surveillance could not conclusively establish the nature of Dugar's interaction with Defendant Small. *Id.; see* Gov't Ex. 2B ¶ 136. A "stop and talk" with Dugar enabled investigators to learn Dugar's identity but agents had no basis to question him about his relationship with Defendant Small. *Id.* at ¶ 136. Moreover, Dugar had no criminal history and he did not show up on the pen register and trap and trace data for Defendant Small's telephones. (Tr. of March 12, 2001, at 267–69). As such, this information was not material to a necessity finding.

■ Finally, Defendants also argue that Agent Wilcox had no basis to continue to repeat the exaggerated profit figures in the Affidavits for the First Wiretap's extensions and the Affidavit for the extension of the Second Wiretap when the evidence obtained from the wiretaps clearly did not support such a figure. For the same reasons discussed above, I conclude that these alleged misrepresentations were not intentional or reckless.

Again, even assuming that Defendants have satisfied their burden under *Franks*, I find that, after disregarding the allegedly false material, the Affidavits for the extension Orders are still legally sufficient under my necessity and probable cause analysis. Each of the Affidavits for the extension Orders alleged sufficient additional facts showing the continuing failure of normal investigative procedures to satisfy the standard of section 2518(1)(c). Further, the Affidavits for the extension Orders and the testimony at the *in camera* hearings accurately reflected both the quantities of drugs that Defendant Small was distributing and that the volume of sales or money generated by the Organization was less than agents originally anticipated.

It is clear from the particular information set forth in each Affidavit that the Government's assessment that Defendant Small was a large distributor of crack cocaine was borne out by the number of sales and the amount of crack cocaine he appeared to be selling. Though Defendant Small experienced a downturn in business, the evidence demonstrated that he was still selling a substantial amount of crack cocaine. Based on the foregoing, I conclude that Affidavits for the First Wiretap's extensions and the Affidavit for the extension of the Second Wiretap sufficiently demonstrated that the wiretaps were necessary under §§ 2518(1)(c) and (3)(c) and sufficiently established probable cause pursuant to §§ 2518(3)(a), (b) and (d). Therefore, there is no basis for me to suppress the evidence from the Second

Wiretap and the three wiretap extensions under *Franks v. Delaware.*

## VI. Technical Violations of the Wiretap Statute

### A. Failure to Obtain Proper Department of Justice Authorization

■ Judge Weinshienk was required prior to her issuance of the wiretap Orders to determine, *inter alia*, whether proper Department of Justice authorization had been obtained for each Application. 18 U.S.C. 2516(1); *Bennett*, 825 F.Supp. at 1516. The crux of Defendants' argument is that four of the five wiretap Orders signed by Judge Weinshienk were authorized by an individual without the power to do so.[13]

The Government supplied Judge Weinshienk with 'courtesy copies' of the Applications and lengthy Affidavits one day before the *in camera* hearings where the wiretap Orders were signed.[14] These 'courtesy copies' reviewed by Judge Weinshienk lacked proper Department of Justice authorization. Defendants allege Judge Weinshienk only read the 'courtesy copies' of the Applications and failed to read the *final*, properly authorized Applications that were submitted at the *in camera* hearings. As such, Defendants contend that the 'courtesy copies' are in effect the *final* Applications because they were the bases upon which Judge Weinshienk executed the Orders, *pro forma*, the fol-

lowing day. Accordingly, they demand that the evidence derived from the wiretaps that were authorized in this manner be suppressed in accordance with *Giordano*, *Chavez*, and 18 U.S.C. § 2518(10)(a)(i).[15]

I do not find that Judge Weinshienk neglected her duties in this case. Although Bob Girardi may have been the individual who permitted Agent Wilcox to submit the 'courtesy copies' to Judge Weinshienk, the record reflects that Judge Weinshienk did not sign her Orders based on these 'courtesy copies.' *See, e.g.*, Gov't Ex. 1E, p. 15. Rather, Judge Weinshienk signed the Orders after AUSA Tafoya and Agent Wilcox presented the *final* Applications the following day at the *in camera* hearing. *Id.* Therefore, I will determine whether the chain of authorization of the true, *final* Applications—and not of the 'courtesy copies'—was consistent with statutory dictates. Title 18, U.S.C. § 2516(1) states in pertinent part:

(1) The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, an acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an Application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter, an

---

**13.** All of the Wiretaps in this case with the exception of the second extension to the First Wiretap were allegedly authorized in this manner.

**14.** The Defendants assert that Bob Girardi of the Office of Enforcement Operations permitted Agent Wilcox to submit the 'courtesy copies' to Judge Weinshienk the day before the *in camera* hearings. It is not disputed that Bob Girardi was an inappropriate signatory to authorize *final* Applications.

**15.** 18 U.S.C. § 2518(10)(a) provides, in pertinent part:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
(i) the communication was unlawfully intercepted[.]

order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation.

At the *in camera* hearings, one of the first tasks undertaken by Judge Weinshienk was to determine whether proper and appropriate authorization had been obtained from the Department of Justice for the *final* Applications. Gov't Exs. 1E at 3, 2D at 9–11; 4D at 4–5, and, 5D at 7–8. She concluded and I agree that each *final*, approved Application was authorized by a lawfully designated Justice Department official, *viz.*, John C. Keeney, Bruce C. Swartz or Mary Lee Warren. Delegated authority flowed from Attorney General John Ashcroft to these individuals through Order No. 2407–2001 which was submitted with each Application as "Attachment A." [16] Thus, I find that for each of the Applications and Affidavits, an individual appropriately designated pursuant to § 2516(1) gave approval *before* Judge Weinshienk signed any Order.

Furthermore, Defendants' reliance on *Giordano* and *Chavez* is misplaced. In *Giordano* and *Chavez*, the final applications to the district court recited that Assistant Attorney General Will Wilson, an appropriate Department of Justice official, had authorized the submission of the applications. *Giordano*, 416 U.S. at 509–10, 94 S.Ct. 1820; *Chavez*, 416 U.S. at 566, 94 S.Ct. 1849. It was subsequently determined that the applications had not been approved by Will Wilson, but rather by the Attorney General's Executive Assistant. *Giordano*, 416 U.S. at 510, 94 S.Ct. 1820; *Chavez*, 416 U.S. at 566, 94 S.Ct. 1849. In both cases it was determined that the Executive Assistant was not an appropriate Department of Justice official in accordance with 18 U.S.C. § 2516(1) and suppressed the evidence derived from the wiretaps pursuant to 18 U.S.C. § 2518(10)(a)(i). *Giordano*, 416 U.S. at 512, 94 S.Ct. 1820; *Chavez*, 416 U.S. at 570, 94 S.Ct. 1849.

Similarly, suppression would be appropriate here if Bob Girardi had in fact authorized the *final* Applications submitted to Judge Weinshienk. In the case at bar, however, there is no evidence that Bob Girardi or anyone other than the proper Justice Department official identified in the *final* Applications authorized the submissions of those Applications. At most, Defendants have established that Agent Wilcox received permission to submit the 'courtesy copies' to Judge Weinshienk from Bob Girardi the day before the *in camera* hearings. However, the *final* Applications, submitted at the *in camera* hearings, were authorized by appropriate Department of Justice officials in accordance with 18 U.S.C. § 2516(1). Judge Weinshienk did not sign the wiretap Orders until she was presented with the *final*, properly authorized Applications.

Defendants' argument that Judge Weinshienk failed to read the *final* Appli-

---

**16.** That delegation, in part, provides:
I hereby specially designate the Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred by section 2516(1) of Title 18, United States Code, to authorize Applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any offense specified in Section 2516 of title 18, United States Code.
*See* Gov't Exs. 1A, 2A, 3A, 4A, 5A, Attachment A.

cations is also somewhat strained. The records of the *in camera* proceedings show a careful pattern of behavior by Judge Weinshienk wherein she assiduously determined from AUSA Tafoya and Agent Wilcox whether any changes to the "courtesy copy" had been made and, if so, the exact nature of those changes. Gov't Exs. 1E, 2D, 4D, 5D. Even minor changes in language were brought to the attention of Judge Weinshienk. *See, e.g.*, Gov't Exs. 1E at 3–4, and 2D at 2–5. I do not find fault with Judge Weinshienk's procedure of reviewing the 'courtesy copies' in advance of the *in camera* hearing and, rather than reading the *final* Applications in their entirety, determining whether the *final* Applications differed from the 'courtesy copies' in any way. The rationale for this procedure was set forth in *Borrayo-Gutierrez*, which provided:

> [t]he reason for [providing a courtesy copy] is because the affidavit alone is . . . long. Obviously it would be inefficient for an agent and an Assistant United States Attorney to sit in chambers and wait for a judge to do a through review of the proffered materials. The documents were unsigned when they were given to [the judge]. The primary reason for this is because the purpose of giving the documents in advance is to allow the judge to do a preliminary review and determine if he has any concerns about the materials that could be addressed by the agent and the attorney.

119 F.Supp.2d at 1182–83. My analysis could be different if the Defendants had presented evidence that the *final* Applications differed from the 'courtesy copies' presented to Judge Weinshienk. Howev-er, the Defendants have not demonstrated that the *final* Applications and Affidavits that were presented to Judge Weinshienk were different in any material way from the 'courtesy copies' presented the day before at the *in camera* hearings. Accordingly, I find that Judge Weinshienk's preliminary review of courtesy copies of the Affidavits does not affect the legality of her decision to grant the Government's request for a Title III interception order.

**B. *FAILURE TO NAME THE SPECIFIC GOVERNMENT REPRESENTATIVE AUTHORIZING THE APPLICATION***

 Defendants also argue the Judge Weinshienk's Orders did not comply with 18 U.S.C. § 2518(4)(d) because the specific Department of Justice individual authorizing the Applications was not named. *See, e.g.*, Gov't Ex. 1C at 4. Section 2518(4)(d) expressly provides that wiretap orders shall specify "the identity of the agency authorized to intercept the communications, and of the person authorizing the application." Judge Weinshienk's Order described the authorizing individual not by name, but instead by referring to a "duly designated official of the Criminal Division, United States Department of Justice." Gov't Ex. 1C at 4. Defendants assert that a plain reading of § 2518(4)(d) thus requires the "identity of the 'person,' not an unspecified and unidentified 'duly designated official of the Criminal Division.'" *See* Defs. Lewis and Clark's Findings of Fact and Conclusions of Law at p. 42. Defendants contend that this deviation from the statutory requirements warrants suppression of the evidence derived from the wiretaps pursuant to 18 U.S.C. § 2518(10)(a)(ii).[17] *Id.*

---

**17.** 18 U.S.C. § 2518(10)(a) provides, in pertinent part:

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a

State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted

Defendants' reading of the statute, however, proves to be too literal. For instance, the Supreme Court, in a case cited by Defendants no less, found that suppression of evidence is unwarranted where a wiretap Order incorrectly identified a specific Assistant Attorney General as having authorized a wiretap that actually had been authorized by the Attorney General. *Chavez*, 416 U.S. at 577–78, 94 S.Ct. 1849. The Court noted that:

> [w]hile adherence to the identification requirements of § 2518(1)(a) and (4)(d) [ ] can simplify the assurance that those whom Title III makes responsible for determining when and how wiretapping and electronic surveillance should be conducted have fulfilled their roles in each case, *it does not establish a substantive role to be played in the regulatory system.*

*Id.* (emphasis added). By analogy, a correct, but somewhat general descriptor of the person who authorized the wiretap Applications in this instance is not a grievous problem as long as that individual was statutorily permitted to make the authorization. I have already determined that each Application in this case was authorized by an individual who had specific delegated authority. The failure to include that individual's specific name in the wiretap Orders does not warrant suppression.

### C. FAILURE TO MAKE THE FIRST WIRETAP AFFIDAVIT APPLICATION UPON OATH OR AFFIRMATION

■ Finally, Defendants allege that the Affidavit for the First Wiretap Order, dated March 28, 2001, was not based upon an "oath or affirmation" as required by 18

U.S.C. § 2518(1). Defendants claim that Judge Weinshienk improperly authorized the First Wiretap following her review of an unsigned Affidavit submitted by Agent Wilcox. I disagree. As I detailed above, Defendants erroneously would have the preliminary *courtesy copies* masquerade as the *final*, signed Applications. In essence, this claim by Defendants fails because I remain convinced that the 'courtesy copies' were not the true, *final* Applications and there is no evidence before me that the First Wiretap Order was signed prior to the Application and Affidavit being signed upon oath or affirmation to Judge Weinshienk. Therefore, I find that the Order authorizing the First Wiretap was based upon the "oath or affirmation" of Agent Wilcox that is required by 18 U.S.C. § 2518(1). Again, the fact that Judge Weinshienk reviewed an unsigned Affidavit beforehand is unimportant. *See Borrayo–Gutierrez*, 119 F.Supp.2d at 1182–83.

### VII. FAILURE TO NAME TWO INTERCEPTEES IN THE FIRST WIRETAP APPLICATION

■ The Defendants also assert that the evidence derived from the First Wiretap should be suppressed because the Application and Affidavit for that wiretap failed to include the names of Defendants Edward Palmer and Theolian Lloyd as interceptees even though the Government had developed probable cause against them. Although the Defendants bear the burden on this issue, they have done little to demonstrate that the Government had probable cause to believe that Defendants Palmer and Lloyd were committing the offense for which the wiretap was sought as of March 28, 2001. Simply indicating

pursuant to this chapter, or evidence derived therefrom, on the grounds that—

. . . . .

(ii) the order of authorization or approval under which it was intercepted is insuffi-

cient on its face[.]

that telephones subscribed in their names showed up on the Pen Registers and Trap and Trace Devices employed during the pre-wiretap investigation is not persuasive. As I discussed previously and incorporate herein, this evidence could not conclusively demonstrate that Defendants Palmer and Lloyd were the individuals actually calling Defendant Small.

 Even if I assume there was probable cause as to Palmer and Lloyd, the omission of their names from the list of interceptees does not automatically warrant suppression. Suppression is only appropriate where the failure to name an individual as an interceptee "play[ed] a 'substantive role' with respect to judicial authorization of intercept orders." *United States v. Donovan*, 429 U.S. 413, 435, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). As I set forth fully *supra*, the statutory preconditions for the First Wiretap were satisfied in this case. Accordingly, even if I were to assume that the Government was required to name Defendants Palmer and Lloyd in the Application for the First Wiretap, the Government's failure to do so would not preclude judicial authorization of the First Wiretap.

## VIII. MINIMIZATION

 Defendants' motions to suppress allege that the Government failed to properly minimize innocent phone calls. However, with the exception of Call No. 47, which will be addressed in a separate order, the Defendants do not appear to seriously challenge any of the minimization procedures in these wiretaps. In fact, the Defendants' Proposed Findings of Fact and Conclusions of Law omit any mention of minimization whatsoever. Title 18, U.S.C. § 2518(5) requires that wiretaps "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." The Government's mini-

mization efforts are evaluated based upon "the reasonableness of the agents' efforts to refrain from monitoring conversations deemed non-pertinent to the investigation." *United States v. Willis*, 890 F.2d 1099, 1101 (10th Cir.1989). Under *Willis*, the minimization must be objectively reasonable under a mathematical formula set forth in that case. 890 F.2d at 1102. As the Government correctly notes, reasonableness is determined from the specific facts and circumstances of each case. *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir.1994).

At the hearing on March 11, 2002, Agent Wilcox presented evidence concerning the rate of minimization. Agent Wilcox testified that of the 1,830 interceptions on the cellular phone with the number (720) 291–7113, 28 calls were nonpertinent but were not minimized within the first two minutes. (Tr. of March 11, 2002, pp. 144–49). Using the *Willis* formula, this results in a 60% success rate. Further, Agent Wilcox testified that for telephone number (720) 747–4732, 24 calls were nonpertinent but were not minimized in the first two minutes. (*Id.* at 149–51). The minimization rate for that telephone was 77%. Accordingly, I am convinced that even in the light most favorable to Defendants, the specific facts and circumstances of this case indicate that the Government has complied with the minimization requirements of § 2518(5) and *Willis*.

## IX. PROBABLE CAUSE

 In addition to the probable cause arguments addressed in the *Franks* section of this Order (Section V.), Defendants argue that probable cause must be demonstrated as to each Defendant individually. However, the Government was not required to establish probable cause as to *each* interceptee. *United States v. Nunez*, 877 F.2d 1470, 1472 n. 1 (10th Cir.1989);

*Carrillo,* 123 F.Supp.2d at 1253. Therefore, the Government was not required to establish probable cause as to every interceptee in this case. As I stated previously, there is ample support for Judge Weinshienk's conclusion that probable cause existed for all the wiretaps and I will disregard Defendants' meritless contention that an individualized probable cause showing is required in this case.

## X. CONCLUSION

Based on the foregoing, it is

ORDERED that Defendant Willie Small's Motion to Suppress Wiretap Evidence and for a Franks Hearing filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Keyonna Davis' Motion to Suppress Interceptions of Wire Communications of Defendant filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Alvin Green's Motion to Suppress Evidence Derived from Court Ordered Interceptions of Electronic Wire Communications and for Franks Hearing filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Theolian Lloyd's Motion to Suppress Information Obtained in Illegal Wiretaps filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Curtis Hawkins' Motion to Suppress Electronic Communications and for Franks Hearing (Wiretap Evidence) filed August 17, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Zebedee Hall's Motion to Suppress Wiretap Evidence and for Franks Hearing filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Edward Palmer's Motion to Suppress Wiretap Evidence and for Franks Hearing filed November 16, 2001, is **DENIED IN PART and DENIED AS MOOT IN PART**. It is **DENIED AS MOOT** as to the suppression of call No. 47 pursuant to the Court's Order dated September 24, 2002, and **DENIED** in all other respects. It is

FURTHER ORDERED that Defendant Frederic Williams' Motion to Suppress Evidence Obtained by Wiretaps filed August 17, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant George Melvin Murray's Motion to Suppress Wiretap Evidence and for Franks Hearing filed August 17, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Victor Mendinghall's Motion to Suppress Wiretap Evidence filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Sammy Lee Woods' Motion to Suppress Various Wiretap Interceptions and the Fruits Thereof filed August 17, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Ronald Dennis Clark's Motion to Suppress Interceptions of Wire Communications and Request for Leave to Supplement this Motion After an Evidentiary Hearing filed November 16, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Timothy Chandler's Motion to Suppress Wiretap Evidence and for a Franks Hearing filed November 15, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Brian Harris' Motion to Suppress Wiretap Evidence and for Franks Hearing August 17, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Angela Hernandez's Motion to Suppress Wiretap and for a Franks Hearing filed December 17, 2001, is **DENIED**. It is

FURTHER ORDERED that Defendant Timothy Chandler's Motion to Strike Ex-

hibits 1 and 2, the Affidavits of Laurie Michelson and Gary Valko From the Government's Supplement to Response to Defendants' Request for Suppression of Wiretap Evidence filed August 2, 2002, is **GRANTED.**